**MINISTRY OF HEALTH, PROVINCE OF ONTARIO, CANADA; Her Majesty in Right of the Province of Manitoba, Plaintiffs,**

v.

**SHILEY INCORPORATED, a California corporation, formerly known as Pfizer Hospital Products Group, Inc., a Delaware corporation, Defendants.**

No. SACV 93–691–GLT[GJ].

United States District Court,
C.D. California.

Aug. 1, 1994.

James T. Capretz, Law Offices of James T. Capretz, Newport Beach, CA, for plaintiffs.

Pierce O'Donnell, Kenneth A. Freeling, Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, CA, Frank C. Rothrock, John R. Lister, Palimieri, Tyler, Wiener, Wilhelm & Waldron, Irvine, CA, for defendants.

## RULING ON MOTION TO DISMISS

TAYLOR, District Judge.

In this defective heart valve case brought by Canadian plaintiffs, the court rejects a consistent line of developing authority, and holds plaintiffs' claims are not subject to blanket preemption by the Medical Device Amendments of 1976 (21 U.S.C. § 301 et seq.). However, under the *Piper* rule, the court applies the forum non conveniens doctrine, holding that Canada is the proper trial forum.

## I. *BACKGROUND*

Plaintiffs, the Canadian provinces of Manitoba and Ontario, provide health care insurance for all of their citizens. Eight hundred of their insureds have received the Shiley Convexo–Concave heart valve, which fractures in a small percentage of patients. Plaintiffs seek 1) a judicial declaration that they are entitled to reimbursement by Defendants for past and future medical services and benefits paid to their insureds because of valve-related injuries, and 2) damages for medical services that have been paid in the past. Plaintiffs assert diversity jurisdiction under 28 U.S.C. § 1332.

Defendants move to dismiss the claim, asserting three arguments: (1) This court lacks subject matter jurisdiction because the claims fall below the requisite $50,000 in controversy; (2) The claims are all preempted by the Medical Device Amendments of 1976 (21 U.S.C. § 301 et seq.); and (3) Canada is a more appropriate forum under the forum non conveniens doctrine.

## II. *DISCUSSION*

For the reasons stated below the court concludes it has subject matter jurisdiction and the claims are not subject to blanket preemption. However, the court determines Canada is the appropriate forum under the forum non conveniens doctrine.

### 1. *SUBJECT MATTER JURISDICTION*

Defendants argue that plaintiffs have failed to allege the requisite amount in controversy for the damage claims already incurred. Further, they argue that plaintiffs' declaratory relief claims fail to state a "case or controversy" as required by Article III of the Constitution.

#### a. *Case or Controversy*

■ Article III requires that, as a prerequisite to standing, a plaintiff present a "case or controversy." As the Supreme Court has explained:

> Abstract injury is not enough. The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" . . . and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."

*City of Los Angeles v. Lyons,* 461 U.S. 95, 101–2, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983) (citations omitted).

Despite the seemingly clear statement of the rule, its application to individual situations is highly contextual: "It is difficult to characterize the point at which a threat of future injury becomes 'credible,' and the caselaw defies easy generalization." *Smith v. City of Fontana,* 818 F.2d 1411, 1421 (9th Cir.1987), *citing Sample v. Johnson,* 771 F.2d 1335, 1340–43 (9th Cir.1985).

In *Nelsen v. King County,* 895 F.2d 1248 (9th Cir.1990) the Ninth Circuit noted: "While it is generally acknowledged that the threat of future harm may confer standing on a litigant, the degree of threat that is required has never been precisely articulated." *Id.* at 1250. The court reviewed cases that had attempted to iron out the requisite risk of future harm, and concluded: "Whether the standard employed is defined as 'credible threat,' 'sufficient likelihood,' or 'demonstrated probability,' our analysis is assisted by a few basic principles that serve to guide our inquiry." *Id.* According to one of these principles, a plaintiff must show more than "a

probabilistic estimate that the general circumstances to which the plaintiff is subject may produce future harm, but rather an individualized showing that there is 'a very significant possibility' that the future harm will ensue." *Id.* at 1250 (citation omitted). The court also observed that "there is a trend towards imposing tighter restrictions on claims of standing for injunctive claims predicated on allegedly recurrent injuries." *Id.* at 1251. *Accord Stewart v. M.M. & P. Pension Plan,* 608 F.2d 776, 785 (9th Cir. 1979), ("[F]or a case or controversy in the constitutional sense, there must be an issue which is not remote and hypothetical but which is real and present.")

However, the Ninth Circuit has upheld claims for declaratory relief for future harm. *Coral Construction Co. v. King County,* 941 F.2d 910 (9th Cir.1991) (permitting construction company's declaratory and injunctive relief action challenging the validity of a minority set-aside program). Of particular relevance to the instant case is *Sample v. Johnson,* 771 F.2d 1335, 1340–43 (9th Cir.1985), in which the court dismissed as moot [1] two longshoremens' claims for a declaration that the government had an obligation to conduct claim hearings and render timely decisions. In *dicta* the court discussed what bearing statistical evidence would have on the "case or controversy" requirements:

> The instant matter is the paradigmatic case for a statistical showing of likely recurrent injury. Here, the predicate to a claim is a physical injury. There are few occurrences that are more assiduously recorded than physical injuries.... There are many likely sources for establishing the probability that a longshoreman will be seriously injured.... With such statistics, a prediction could be made as to whether one with the same work-life expectancy as [plaintiff] is likely to experience another claimable injury.
>
> The cases have also not indicated what *degree* of probability is required where a plaintiff can show a likely recurrence of injury. Query whether the test should be

one of more likely than not, i.e.... more than fifty-fifty, or whether the test should be one where probability, in the strict sense, is not required, but merely some significant possibility.... [W]e prefer to describe "probability" qualitatively, as requiring a very significant possibility, and not quantitatively, as mandating a "greater than fifty percent" likelihood.

*Id.* at 1343.

In the present case, plaintiffs present statistical evidence showing a significant possibility of future injury to plaintiffs' insureds, which gives them standing. According to the showing made, the estimated fracture rate for one type of subject heart valve ranges from .02 percent to 1.24 percent per year, depending on the valve size and the "weld date" (date of manufacture). The estimated fracture rate for the other type of valves involved, which were implanted only in Canada, ranges from .19 to 2.25 percent per year. Given these statistics and the fact that 800 Canadians have been implanted with one of the two valves, plaintiffs have shown future harm that is more than hypothetical. If the overall fracture rate were one percent per year, plaintiffs could expect eight implantees to experience fracture and attendant medical complications after one year. After five years, approximately forty implantees would have experienced fracture. These injuries are statistically predictable, and thus are "significantly possible" in plaintiffs' citizens. Since plaintiffs will have to pay for the medical care of any injured implantee, their injury is "real and present" and meets Article III's case or controversy requirement.

### b. *Amount in Controversy*

■ Defendants further argue that, since the only *actual* damages requested by plaintiffs are $7,900 for a single insured's valve replacement, plaintiffs have failed to meet the jurisdictional minimum. However, since the court has concluded plaintiffs have standing for their declaratory relief claim, plaintiffs may meet their jurisdictional minimum

---

1. Although the issue in *Sample* was mootness, while in the instant case the issue is standing, the applicable standards are the same: "[T]he interest required of a litigant to attain standing is

essentially the same as the interest required to maintain a claim under the mootness doctrine." *Nelsen v. King County,* 895 F.2d 1248, 1250 (9th Cir.1990).

through that claim instead of their claim for present damage. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Although *Hunt* involved federal question jurisdiction, 28 U.S.C. § 1331, its analysis of the amount in controversy requirement for declaratory relief actions is applicable here. The court stated, "it is well established that the amount in controversy is measured by the *value of the object of the litigation.*" *Id.* at 347, 97 S.Ct. at 2443 (emphasis added).

In this case, the "value of the object of the litigation" is the amount of money that plaintiffs will have to pay for medical care of their insureds should a heart valve fracture. Obviously, neither the exact number of fractures nor the time period of fracture is a known quantity. However, if the fracture rate were one percent per year, eight implantees would experience fracture within the first year after implantation.

Defendants argue that the $50,000 amount in controversy requirement is not met because aggregation of individual claims to reach the required amount is not permitted, *citing Zahn v. International Paper Company,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). However, *Zahn* does not apply, as it stands for the proposition that each plaintiff in a *class action* must individually meet the amount in controversy and aggregation of *class members'* claims is not permitted. This case is not a class action; rather, plaintiffs are insurers who seek a declaration of their own right to subrogate future liability. If that future liability is potentially greater than $50,000, jurisdiction is present.

The parties have shown that medical expenses of $7,900 were incurred relating to one insured. At a one percent fracture rate, eight implantees are likely to experience fracture after one year. With the one expense experience as a guide, it is reasonably likely that the value of the right in question will exceed the jurisdictional amount after one year. Therefore, plaintiffs have met the amount in controversy requirement.

For the reasons stated, jurisdictional requirements are met in this case.

## 2. PREEMPTION UNDER THE MEDICAL DEVICE AMENDMENTS OF 1976

The United States Food and Drug Administration ("FDA") gave premarket approval to the Shiley heart valve as a Class III medical device, subject to the Medical Device Amendments. Before receiving premarket approval, the FDA required Shiley to submit proposed labeling information, safety testing data, and descriptions of methods and materials used to manufacture the device. 21 U.S.C. § 360e(c)(1). Once it received premarket approval, Shiley was required to maintain records and make reports to the FDA, which had regulatory authority over the product. The FDA retained the power to withdraw its approval and remove the device from the market. 21 U.S.C. §§ 360h, 360i; *Michael v. Shiley,* No. 93–1729, 1994 WL 59349 (E.D.Pa. Feb. 25, 1994). In 1990, in response to evidence of strut fractures, Shiley requested that the FDA withdraw its premarket approval. *Id.*

Citing a developing line of cases that consistently supports their position, defendants contend that plaintiffs' claims are fully preempted by the Medical Device Amendments of 1976. This is apparently a novel question in the Ninth Circuit. In a departure from the developing case authority, the court holds plaintiffs' claims are not subject to blanket preemption.

### a. The presumption against preemption.

Article VI of the Constitution, the Supremacy Clause, provides that federal law has priority over state and local laws. This permits Congress to enact laws of national applicability even if they contravene state statutes. Congress may effect preemption through either "express" or "implied" means. Express preemption requires that Congress state affirmatively its intention to preempt or supersede state law,[2] whereas implied preemption is determined by judicial inference "where the scheme of federal regulation is

**2.** Marilyn P. Westerfield, *Federal Preemption and the FDA: What Does Congress Want?* 58 U.Cin.L.Rev. 263, 265 (1989).

sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough County v. Automated Medical Laboratories*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985), *citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

■ The Supreme Court has consistently imposed a strong presumption against preemption if it would mean superseding a state's historic police powers: "When considering pre-emption, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S.Ct. 2476, 2482, 115 L.Ed.2d 532 (1991), *citing Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), *citing Rice* 331 U.S. at 230, 67 S.Ct. at 1152.

The presumption against preemption is particularly strong when the regulations in question relate to health and safety. "[T]he regulation of health and safety matters is primarily and historically a matter of local concern." *Hillsborough*, 471 U.S. at 719, 105 S.Ct. at 2378, *citing Rice* 331 U.S. at 230, 67 S.Ct. at 1152. *See also Abbot by Abbot v. American Cyanamid Co.*, 844 F.2d 1108, 1112 (4th Cir.1988) ("The presumption against preemption is even stronger against preemption of state remedies, like tort recoveries, where no federal remedy exists.").

■ Even in areas where Congress has implemented comprehensive legislation, courts have been reluctant to construe such legislation as barring recovery under state

tort law. In *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Supreme Court upheld an award of punitive damages to the estate of a deceased lab analyst injured by a plutonium release, despite federal regulatory control of nuclear facilities by the Nuclear Regulatory Commission. The defendant argued that, since the Court had previously acknowledged the Federal Government's occupation of the entire field of nuclear safety regulation,[3] and had held such regulation could be exerted through the award of damages,[4] the award of punitive damages under state tort law constituted impermissible state regulation.

The Supreme Court, however, distinguished between Congressional preemption of state safety regulations and Congressional preemption of tort law, and construed the Congressional silence concerning the latter as evidence that Congress did not intend to preclude the use of state-law remedies. The fact that Congress failed to provide any federal remedy for those injured in nuclear accidents gave this silence added significance: "It is difficult to believe that Congress would, without comment, remove all means of recourse for those injured by illegal conduct." *Silkwood*, 464 U.S. at 251, 104 S.Ct. at 623.

The *Silkwood* Court was mindful that drawing a line between state regulations and state tort law could undermine the goals that exclusive federal regulation of the field was intended to accomplish. Nevertheless, it upheld what it viewed as Congress' intent, explaining:

No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate

---

**3.** *See Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 212, 103 S.Ct. 1713, 1726, 75 L.Ed.2d 752 (1983) ("the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States.")

**4.** *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.")

whatever tension there was between them. We can do no less.

*Id.* 464 U.S. at 256, 104 S.Ct. at 625.

Although *Silkwood* involved an implied preemption analysis, its hesitancy to preclude recovery of damages must still be given great weight. This hesitancy is also reflected in a D.C. Circuit opinion concerning pesticide regulation. In *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.1984), the court held that Congressional preemption of state labeling requirements for pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) did not preempt tort suits based on the inadequacy of the manufacturer's labeling of the herbicide paraquat, despite prior approval of the label by the Environmental Protection Agency (EPA). The Court distinguished between labeling that was adequate *for the purpose of the federal statute, Id.* at 1540, and labeling that satisfied tort law. While Congress' purpose in enacting FIFRA was to prevent, consistent with a cost-benefit analysis, "unreasonable adverse effects on the environment," state tort law might have more far-reaching compensatory goals. Thus a label could be inadequate under state tort law even if it was sufficient under a cost-benefit standard.

The court also relied on the traditional deference given states in protecting their citizens:

> [F]ederal legislation has traditionally occupied a limited role as the *floor* of safe conduct; before transforming such legislation into a *ceiling* on the ability of states to protect their citizens, and thereby radically adjusting the historic federal-state balance ... courts should wait for clear statement

of congressional intent to work such an alteration.

*Id.* at 1543 (citation omitted).[5]

Of course, neither *Silkwood* nor *Ferebee* is dispositive of Congressional intent to preempt under the Medical Device Amendments. However, the cases do show a clear judicial attitude of hesitancy to leave plaintiffs without a remedy for damages, even where Congress has regulated extensively.

### b. *The Medical Device Amendments of 1976.*

#### 1. *History*

Although it might be assumed that drugs and medical devices are subject to common regulatory controls and share a common legislative history, such is not the case. While drugs were subject to federal regulation as early as 1906,[6] devices were not even listed in the legislation until Congress passed the Food, Drug and Cosmetic Act of 1938, 21 U.S.C. § 301 *et seq.* (1990) (FDCA), and then only as a step-child of increased federal control over drugs.[7] The FDCA statute was passed, in part, as a legislative response to public outcry following numerous drug toxicity deaths from Elixir–Sulfanilamide,[8] and empowered the FDA to require pre-market testing of drugs, as well as post-marketing controls over manufacturers. In contrast, medical devices were subject to regulation only after they were introduced into interstate commerce.

In the aftermath of the European thalidomide tragedy, Congress enacted the Drug Amendments of 1962, 21 U.S.C. § 355 (1990), which required that manufacturers demonstrate both the safety and effectiveness of drugs before marketing them, and also expanded post-marketing controls. Devices

---

**5.** Some courts have contended the *Ferebee*'s holding does not survive *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). *See, e.g., Bingham v. Terminix Intern. Co., L.P.,* 850 F.Supp 516, 519 n. 3 (S.D.Miss.1994), *citing Stamps v. Collagen Corp.,* 984 F.2d 1416, 1424 (5th Cir.1993).

**6.** Susan Bartlett Foote, *Loops and Loopholes: Hazardous Device Regulation Under the 1976 Medical Device Amendments to the Food, Drug and Cosmetic Act,* 7 Ecology L.Q. 101, 106 (1978). *See also* Pennington Parker Landen,

*Federal Preemption and the Drug Industry: Can Courts Co-regulate?* 43 Food Drug Cosm.L.J. 85, 97–98 (1988).

**7.** Foote, *supra* note 6 at 106–7.

**8.** REPORT OF THE SECRETARY OF AGRICULTURE ON DEATHS DUE TO ELIXIR–SULFANILAMIDE–MASSENGILL, S. DOC. NO. 124, 75th Cong., 2d Sess. 1 91937), *cited in* Foote, *supra* note 6 at 106 n. 23.

were not treated the same: "The conceptual distinctions between drugs and devices created by the 1938 Act remained a barrier in the minds of legislators to generalizing the thalidomide lesson beyond the medical concept of drugs." [9]

The medical device "crisis moment" came with the Dalkon Shield. This contraceptive device, as well as heart valves and pacemakers, became the symbols that spurred Congressional action to protect the public from the harmful effects of a largely unregulated device industry.[10] As federal investigations demonstrated, the pace of the industry far exceeded the FDA's ability to control it, and from 1960 to 1970 at least 10,000 injuries were attributed to medical devices.[11]

Following Congressional hearings and reports by FDA officials,[12] Congress passed the Medical Device Amendments of 1976. The Senate Report accompanying S.2368, the bill that became the MDA, indicates the legislators' preoccupation with Dalkon Shield injuries and the FDA's inability to prevent dangerous devices from getting on the market: "Increasing numbers of patients have been exposed to increasingly complex devices which pose serious risk if inadequately tested or improperly designed or used." [13] In introducing the legislation, Senator Edward Kennedy stated: "The purpose of this legislation is to protect the health and safety of the American people ... the legislation is written so that the benefit of the doubt is always given to the consumer. After all it is the consumer who pays with his health and his life for medical device malfunctions." [14]

In enacting the MDA, Congress also confirmed its desire to foster research and development of devices that held the promise of improving the health and longevity of the American people.[15] "[A]n increasing number of sophisticated, critically important medical devices are being developed and used in the United States.... the Committee wants to encourage their research and development." [16]

Under the MDA, the FDA is authorized to assign medical devices to three different classes, depending on the amount of regulation needed. While general controls and labeling provisions govern all devices, and Class II devices must additionally conform to performance standards established by the FDA, Class III devices are subject to the most stringent requirement of premarket approval.

### 2. The Statutory Language

The applicable law, 21 U.S.C. § 360k, entitled "State and local requirements," provides:

(a) General Rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish ... with respect to a device intended for human use any requirement—

(1) Which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter in a requirement applicable to the device under this chapter.

Section 360(h) discusses the FDA's power to remove unsafe devices from the marketplace. It provides that a "device ... [that] presents an unreasonable risk of substantial harm to the public health," may be subject to

9. Foote, *supra* note 6 at 107–8.

10. Mary J. Boguslaski, *Classification and Performance Standards Under the 1976 Medical Device Amendments*, 40 Food Drug Cosm.L.J. 421 (1985).

11. Foote, *supra* note 6 at 102–3.

12. *See, e.g.* COOPER COMMITTEE, U.S. DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE, MEDICAL DEVICES: A LEGISLATIVE PLAN, STUDY GROUP ON MEDICAL DEVICES (1970), *cited in* Foote, *supra* note 6 at 110 n. 49.

13. S.Rep. No. 94–33, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 1074.

14. 121 Cong.Rec. 59, 10688 (1975).

15. S.Rep. No. 94–33, 94th Cong., 2d Sess. (1976), *reprinted in* U.S. Cong. & Admin.News 1070, 1071.

16. *Id.*

an order by the Secretary requiring the repair, replacement, refund or recall of the device. Section 360h(d) states: "Compliance with an order issued under this section shall not relieve any person from liability under Federal or State law."

Plaintiffs argue that 360h(d) demonstrates that Congress did not intend to preempt state tort law requirements for devices presenting unreasonable risk to the public. Defendants counter that 360h(d) could be referring to non-preempted civil damages actions, such as those brought by a distributor seeking damages from adverse publicity.

3. *Federal and FDA Regulations of Class III Devices, including Heart Valves*

Under 21 C.F.R. § 870.3925, written by the agency charged with implementing the legislation, artificial heart valves are Class III medical devices. FDA regulation of the design and manufacture of Class III devices is extensive. For example, 21 U.S.C. § 360e(c)(1) requires FDA evaluation and premarketing approval of the components, ingredients, and properties and of the principle or principles of operation of the device, of the proposed labeling of the device, and of the methods used in, and the facilities and controls used for, the manufacture and processing of such device. Section 360e(d)(2) of the MDA provides that the FDA "shall deny approval" of an application for premarket approval if "there is a lack of a showing of reasonable assurance" that the device is "safe" and "effective," or if the methods used in the manufacture of the device do not conform to current "good manufacturing practice." Further, 21 U.S.C. § 360j(f) and 21 C.F.R. Part 820 prescribe current "good manufacturing practices," and 21 U.S.C. §§ 360(h) and 374 provide that manufacturers of Class III devices are subject to FDA inspection.

4. *FDA Statements About Preemption*

The FDA's implementing regulations are of key importance. They discuss both the meaning of "requirement" and the effect of the legislation on tort law. The regulations provide:

> Section 521(a) [360k] of the act contains special provisions governing the regulation

of devices by States and localities. That section prescribes a general rule that after May 28, 1976, no State or political subdivision of any State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or *court decision*), which is different from, or in addition to, any requirement applicable to such device under any provision of the act, and which relates to the safety or effectiveness of the device....
21 C.F.R. § 808.1(b) (emphasis added).

Defendants point to the "court decision" language as evidence that state tort law claims are preempted. However, this interpretation is in conflict with 21 C.F.R. § 808.-1(d)(1), which states:

> Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g. requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

In addition, in an Advisory Opinion issued under 21 C.F.R. § 808.1, the Office of the Chief Counsel for the FDA stated:

> Under section 521(a) [21 U.S.C. § 360k] of the act, the act preempts only State and local requirements that directly and specifically relate to devices. For a State provision to be a requirement with respect to a device within the meaning of section 521 of the act, and thereby a candidate for preemption, it is necessary that the State provision relate to the device itself. *There is no indication in the legislative history of section 521(a) that Congress intended that the section preempt State or local requirements respecting general enforcement, including available legal remedies,* or State or local statutes that only incidentally apply to devices. Rules or requirements established by States to govern the legal remedies available under the State judicial system are not "requirements with respect to a device" within the meaning of section 521(a) of the act.

Advisory Opinion by Joseph P. Hile, Associate FDA Commissioner for Regulatory Affairs, Docket No. B3A–0140/AP, Mar. 2, 1984 (emphasis added).

Courts concluding that preemption exists have done so despite the FDA's statements and regulations. Although they have acknowledged the judicial doctrine that an agency's interpretation of the statute it is charged with administering is controlling so long as it does not contravene Congress's intent, *Chevron v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), they rely on the rule that "when a statute is clear the agency interpretation must give way." *King v. Collagen Corp.,* 983 F.2d 1130, 1139 (1st Cir.1993), *citing Hillsborough County,* 471 U.S. at 714–15, 105 S.Ct. at 2375–76. Since, in the opinion of these courts, Congressional intent to preempt state tort law is clear, it overrides any contrary statement by the agency.

c. *Court Rulings on the MDA Preemption Issue*

It is not disputed that section 360k expressly preempts "requirements" that conflict with the MDA. The issue is whether section 360k preempts all state tort law as well as state regulations and statutes.

The key authority stating the rule for preemption of state law claims is the Supreme Court's decision in *Cipollone v. Liggett Group, Inc.,* — U.S. —, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), a case of breach of warranty, failure to warn, intentional fraud and misrepresentation, and conspiracy by a long-term smoker's estate against the cigarette manufacturer. Preemption was urged under the Public Health Cigarette Smoking Act of 1969, specifically section 5(b), which states:

No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of the Act.

*Id.* — U.S. at —, 112 S.Ct. at 2617 (quoting from statute).

The *Cipollone* Court first held that section 5(b) included common law actions.

The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules.... Moreover, common law damages actions of the sort raised by petitioner are premised on the existence of a legal duty and it is difficult to say that such actions do not impose "requirements or prohibitions."

*Id.* — U.S. at —, 112 S.Ct. at 2620. However, the Court stressed that section 5(b) did not act as a *blanket* bar to all state law actions:

That the pre-emptive scope of § 5(b) cannot be limited to positive enactments does not mean that that section pre-empts all common law claims. For example, as respondents concede, § 5(b) does not generally pre-empt "state-law obligations to avoid marketing cigarettes with manufacturing defects or to use a demonstrably safer alternative design for cigarettes." *For purposes of § 5(b), the common law is not of a piece.*

*Id.* — U.S. at —, 112 S.Ct. at 2621 (emphasis added).

The *Cipollone* Court stated a test to review each tort claim in turn:

[W]e must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of § 5(b) and we must look to each of petitioner's common law claims to determine whether it is in fact pre-empted. The central inquiry in each case is straightforward: *we ask whether the legal duty that is the predicate of the common law damages action constitutes a "requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion," giving that clause a fair but narrow reading.*

*Id.* — U.S. at —, 112 S.Ct. at 2621 (emphasis added).

Applying this standard, the Court held the claims based on failure to warn and the neutralization of federally mandated warn-

ings were preempted to the extent those claims relied on omissions or inclusions in the manufacturer's advertising or promotions. However, the Court held the Act did not preempt claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.

The Court stated that to establish liability under a failure to warn theory it must be shown that a warning was necessary to make the product safe, suitable, and fit for its intended use, respondents failed to provide such a warning, and the failure was a proximate cause of the injury. Since section 5(b) expressly preempted additional requirements relating to advertising or promotion, the Court held a failure to warn theory directed at insufficient advertising and promotion was preempted.

However, the Court held that a breach of contract action is not based on a "requirement imposed under state law," within the meaning of the statute, but rather is derived from the terms of the warranty:

> Accordingly, the "requirements" imposed by an express warranty claim are not "imposed under State law," but rather imposed *by the warrantor.* If, for example, a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement . . . based on smoking and health, with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement . . . *imposed under State law*" within the meaning of § 5(b).

*Id.* —— U.S. at ——, 112 S.Ct. at 2622 (emphasis added).

The Court held that the fraudulent misrepresentation claim was not preempted, even when it related to advertising or promotion, because "[s]uch claims are not predicated on a duty 'based on smoking or health' but rather on a more general obligation—the duty not to deceive." *Id.* —— U.S. at ——, 112 S.Ct. at 2624. Similarly, regarding the conspiracy to misrepresent or conceal material facts, the Court stated: "The predicate duty underlying this claim is a duty not to conspire to commit fraud," and not a duty "based on smoking or health," and therefore is not preempted. *Id.*

The first case to apply the *Cipollone* test to Class III medical devices under the Medical Device Amendments of 1976 was *King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), involving an implantable cosmetic product designed to alleviate wrinkles. Plaintiff brought claims under strict liability, breach of warranty of merchantability, negligence in design, manufacturing, marketing and sale of the product, failure to warn, and fraudulent attainment of FDA approval. In holding that all these claims were preempted, the court was influenced by what it viewed as the extensive premarket approval requirements that manufacturers had to go through and the legislative purpose to promote development of new medical technology:

> Public health is a valid federal purpose, and Congress can reasonably weigh possible loss to the idiosyncratic few against benefits to the public generally . . . The legislative history shows that this was precisely the Congressional intent. Concededly . . . the principle emphasis [was] . . . on the protection of the individual user. But [the legislative history] also shows the intent to "encourage . . . research and development" and "permit new and improved devices to be marketed without delay." . . . *Perfection is impossible and a few individuals may be denied full protection at the cost of benefitting the rest.*

*Id.* at 1138 (emphasis added, citations omitted).

*King* has become the leading case in the Medical Device Amendments preemption field. Relying in large part on *King*'s reasoning and analysis, the First and Fifth Cir-

cuits, and numerous district courts, with one exception, have followed a rule of blanket preemption for class III devices.[17]

Like the *Cipollone* Court, the *King* court reviewed plaintiff's action claim by claim. But, this court cannot agree with all of *King's* conclusions.

1. *Negligence, Misbranding and Failure to Warn.*

■ *King's* conclusion that claims for negligence, misbranding and failure to warn are preempted appears correct.

*King* held that claims alleging *negligence* in the design, manufacture, marketing and sale of Zyderm were preempted. "If the MDA does nothing else, it regulates the design, manufacture, sale and marketing of class III medical devices in an extensive way. The MDA does this through the packaging and labeling requirements which directly affect the marketing and sale of the product.

The same requirements also affect the design and manufacture of the product in that these processes must be approved by the FDA and described in the product's packaging and labeling." *Id.* at 1136. Thus, since the FDA tells the manufacturer what labeling, packaging, design, and manufacture are acceptable, to permit a finding of negligence would mean implicitly finding that the FDA approval was not good enough, and thereby impose a higher standard, in contravention of the MDA.

■ Similarly, the MDA defines *misbranding* under the statute as labeling that is "false or misleading in any particular." 21 U.S.C. § 352(a). Before approval of a device, the FDA must make a finding that the labeling is not false and misleading. 21 U.S.C. § 360e(d)(2)(D). To sustain a claim for misbranding would require showing that the FDA finding was wrong, which would create a requirement different from and in addition to the MDA.

---

17. *Mendes v. Medtronic Inc.*, 18 F.3d 13 (1st Cir.1994) (preempting state claims against pacemaker manufacturer, where device bypassed premarket approval through 510(k) Notification and finding of "substantial equivalence"); *Stamps v. Collagen Corp.*, 984 F.2d 1416 (5th Cir.1993) (preempting state law claims against manufacturer of anti-wrinkle product); *English v. Mentor Corp.*, No. CIV.A. 93–2725, 1994 WL 263353 (E.D.Pa. June 13, 1994) (preempting tort claims against manufacturer of penile prosthesis, which bypassed premarket approval through 510(k) notification); *Brown v. Medtronic, Inc.*, 852 F.Supp. 717 (S.D.Ind.1994) (preempting claims against class III components of spinal cord device ITREL II, but not against class II components of same device); *Kemp v. Pfizer*, 851 F.Supp. 269 (E.D.Mich.1994) (heart valve preemption); *Tucker v. Collagen Corp.*, No. 93 C 2375, 1994 WL 87367 (N.D.Ill. March 16, 1994) (preempting claims against anti-wrinkle implant); *Michael v. Shiley, Inc.*, 1994 WL 59349, 1994 U.S.Dist. LEXIS 3980 (E.D.Pa. February 25, 1994) (preempting claims where patient had heart valve removed to avoid fracture); *Griffin v. Medtronic, Inc.*, 840 F.Supp. 396 (D.Md.1994) (involving pacemaker manufacturer); *Reiter v. Zimmer, Inc.*, 830 F.Supp. 199 (S.D.N.Y.1993) (preempting strict liability claim, but *not* negligent manufacture claim against manufacturer of bone cement); *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015 (E.D.Mich.1993) (preempting claims against heart valve manufacturer); *Murray v. Medtronic, Inc.*, No. CIV.A. No. 93–1196, 1993 WL 515741 (E.D.La. Dec. 3, 1993) (ITREL II). *Schubert v. Medtronic, Inc.*, CIV.A. No. 92–2967, 1993 WL 390110 (E.D.La. September 30, 1993) (ITREL II).

However, some of the courts finding preemption have expressed misgivings about the ramifications of leaving plaintiffs without a remedy: *Bravman v. Baxter Healthcare Corp.*, 842 F.Supp. 747 (S.D.N.Y.1994) (preempting failure to warn claim against heart valve manufacturer, but stating: "It must be recognized that state tort actions ... remain a powerful incentive for improving product safety"); *Cameron v. Howmedica*, 820 F.Supp. 317, 321 (E.D.Mich.1993) (preempting defective design claim against artificial hip manufacturer, but stating: "This Court remains concerned with the lack of a criterion—such as an analysis under the Seventh Amendment—by which these courts are evaluating the reasonableness of a Congressional policy to foreclose victim's common law rights in exchange for the common good. Therefore, it refuses to join any holding or *dicta* that finds Congress has acted in a wise manner in enacting § 360k.").

One district court has summarily rejected the First Circuit's broad reading of § 360k(a), as stated in *Mendes, supra*, noting simply that it is contrary to FDA regulations in 21 C.F.R. § 808.-1(d). *Oja v. Howmedica, Inc.*, 848 F.Supp. 905 (D.Colo.1994) (holding MDA does not preempt claims against artificial hip manufacturer where device subject only to general regulations).

A related line of cases has found preemption for intraocular lenses, which are experimental devices subject to the FDA's "investigational device exemption regulations." *See, e.g., Gile v. Optical Radiation Corp.*, 22 F.3d 540 (3rd Cir. 1994); *Slater v. Optical Radiation Corp.*, 961 F.2d 1330 (7th Cir.1992).

■ Finally, the *failure to warn* claims challenge the adequacy of the labeling and packaging, but the FDA specifically approves those labels. A finding of failure to warn would require an implicit finding that the FDA-approved labels and packages were insufficient, which would mean imposing labels and packages "different from or in addition to" those required by the MDA.

■ However, the MDA would *not* preempt claims that the manufacturer *negligently failed to comply with the FDA's regulations,* since a finding of wrongdoing would merely impose those regulations already imposed by the statute, and would not be "different from or in addition to" those imposed by the MDA. *Reiter v. Zimmer, Inc.,* 830 F.Supp. 199 (S.D.N.Y.1993) (preempting strict liability claim, but *not* negligent manufacture claim against manufacturer of class III bone cement). Here, it is unclear whether plaintiffs' Complaint means to allege that defendant negligently failed to comply with FDA requirements. If plaintiffs intend to make such a contention, they should seek leave to amend to clarify their complaint.

2. *Strict Liability.*

■ The *King* conclusion on strict liability preemption also seems correct. *King* held strict liability was preempted because it would impose requirements related to safety and effectiveness of the product. "If successful, the claim would require [the manufacturer] to redesign [the product], remove it from the market, or be subject to strict liability. The MDA does not permit this. Appellant's claim would force us to determine that [the product] is unsafe and dangerous, in opposition to the contrary determination made by the FDA under the MDA.

Subsection (a) protects manufacturers of medical devices approved by the FDA under the MDA from such state law intrusion." *Id.* at 1135.

This court agrees with *King*'s result. In California, strict liability imposes legal responsibility upon a product manufacturer for injury without proof of negligence, upon a showing of defective design, defective manufacture, or distribution without adequate warnings. *Artiglio v. Superior Court,* 22 Cal.App.4th 1388, 27 Cal.Rptr.2d 589 (1994). In each instance, the predicate legal duty would conflict with the MDA, requiring the jury to make evaluations concerning the "safety and effectiveness" of the device, with a finding of a defect being "different from or in addition to" the statute's requirements. The claim is preempted.[18]

3. *Breach of Warranty.*

■ This court cannot agree with *King* that warranty claims are preempted. The *King* court stated that appellants' express warranty claims arose out of the labeling and packaging of the product, and, since the FDA had to approve each warranty made by the manufacturer, "Allowing appellant's express warranty claims effectively would impose additional or different requirements" on the product's labeling and packaging. *Id.* at 1135.

This reasoning is at odds with *Cipollone.* In *Cipollone* the Supreme Court stated that a warranty claim arises from the manufacturer and not from state law, so that "a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement ... *imposed under State law*'" within the meaning of the subject statute. *Cipollone,* —— U.S. at ——, 112

**18.** The California Supreme Court has established an exemption to general products strict liability rules for prescription drugs. *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). *Brown* held, for policy reasons, that drug manufacturers could not be held strictly liable for design defects in prescription drugs. Further, *Brown* held that drug manufacturers could not be held strictly liable for failure to warn of "risks inherent in a drug ... [that] it neither knew nor could have known by the application of scientific knowledge available at the time of distribution," *Id.* at 1065, 245 Cal.Rptr.

412, 751 P.2d 470, so long as "the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." *Id.* at 1069, 245 Cal. Rptr. 412, 751 P.2d 470.

A California appellate court applied this policy analysis and extended the exemption to the medical devices at issue in that case—breast implants—and, by extension, to all implantable medical devices available only by prescription. *Artiglio v. Superior Court,* 22 Cal.App. 4th 1388, 27 Cal.Rptr.2d 589 (1994).

S.Ct. at 2622. Applying that reasoning to class III devices, a breach of warranty claim is not preempted. Even if its requirements are different from the statute, and even if it relates to safety and effectiveness, it is not "established by the State" but by the manufacturer.

The *King* court itself noted that *Cipollone* "would seem to require the opposite result in this case." *King*, 983 F.2d at 1135. It distinguished the MDA from the statute at issue in *Cipollone* because the MDA requires "much more extensive regulation upon class III device manufacturers." *Id.* However, *Cipollone* did not base its breach of warranty decision on the level of control. It was based on the source of the requirement—the manufacturer, as opposed to the State.

Regarding implied warranty, *King* followed similar reasoning: "As an implied warranty is a requirement upon a product that arises exclusively from the operation of state contract law, this claim is preempted expressly by the MDA. Otherwise, it would impose a requirement additional to those imposed under the MDA." *Id.* at 1135–36. However, *Cipollone* holds warranty claims arise from the manufacturer and are not requirements imposed by the state, so they are not preempted. This court applies *Cipollone* to this case, and holds that breach of warranty claims are not preempted.

4. *Fraud and Misrepresentation.*

■ The *King* court again departed from *Cipollone* concerning fraud and misrepresentation, and this court cannot agree with *King*. *Cipollone* held such claims are based on a general duty not to deceive, rather than the requirements imposed by the state. This is separate from a requirement "relating to the safety and effectiveness of a device." Under the plain language of *Cipollone*, these claims are not preempted.[19]

d. *This Court's Rejection of Blanket Preemption.*

Despite numerous cases to the contrary, this court declines to apply blanket preemp-

tion to state claims concerning Class III devices under the Medical Device Amendments of 1976.

There is a strong presumption against preemption, especially where no alternative remedy is provided. The legislative history of the Amendments shows an intent to protect consumers from medical device injuries, rather than leave them without a remedy. The language of the statute is not specific in creating a blanket preemption.

The FDA's own implementing regulations indicate non-preemption, and those regulations do not clearly conflict with the statute's language. Those regulations are entitled to great weight.

Finally, the clear expression by the Supreme Court in *Cipollone* rules out a blanket preemption. Under *Cipollone*, state claims against class III device manufacturers survive if the legal duty underlying the state claim either has a basis independent of the MDA's focus on the medical device's safety and effectiveness, or arises from the manufacturer and not from the State.

If the intent of Congress were to nullify an entire body of state consumer protection law, and leave the victims without a remedy, it would have specifically said so.

Based upon present authority, the court will grant the motion to dismiss for preemption as to the claims for negligence, misbranding, failure to warn, and strict liability. However, the court will deny the motion as to the claims for breach of warranty, fraud, and misrepresentation, holding that those claims are not preempted.

### 3. *DISMISSAL FOR FORUM NON CONVENIENS*

The standard for considering a dismissal motion for forum non conveniens in a case such as this was established by the Supreme Court in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The Supreme Court held that foreign plaintiffs may not avoid a forum non conveniens motion "merely by showing that

---

**19.** Any contention by plaintiffs that there was fraud on the FDA may raise the separate question of plaintiffs' *standing* to bring that claim.

*See, King.* However, that is a different issue from *preemption,* and is not raised by this motion.

the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum." *Id.* at 247, 102 S.Ct. at 261. "The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry." *Id.* The determination, held the Court, is committed to the sound discretion of the trial court, weighing both private and public interest factors. Holding that the presumption in favor of a plaintiff's forum choice applies with less force where the plaintiff is foreign, the *Piper* court stated the interest factors should be applied flexibly, without giving undue emphasis to any one element. *Id.* at 249–250, 102 S.Ct. at 262–263.[20]

The California Supreme Court first applied the *Piper* rule in *Stangvik v. Shiley,* 54 Cal.3d 744, 1 Cal.Rptr.2d 556, 819 P.2d 14 (1991), holding in a similar heart valve case that California was an inconvenient forum for plaintiffs from Sweden and Norway, when their home countries provided adequate alternative locations for resolution of their actions. The Court stayed the actions, and retained jurisdiction to make such further orders as might become appropriate. The *Stangvik* order was subject to seven conditions, with which defendants agreed to comply.[21] The California Supreme Court set out the process a court must follow in determining a forum non conveniens motion:

> In determining whether to grant a motion based on forum non conveniens, a court must first determine whether the alternate forum is a "suitable" place for trial. If it is, the next step is to consider the private interests of the litigants and the interests of the public in retaining the action for trial in California. The private interest

factors are those that make trial and the enforceability of the ensuing judgment expeditious and relatively inexpensive, such as the ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the availability of compulsory process for attendance of unwilling witnesses. The public interest factors include avoidance of overburdening local courts with congested calendars, protecting the interests of potential jurors so that they are not called upon to decide cases in which the local community has little concern, and weighing the competing interests of California and the alternate jurisdiction in the litigation.

*Id.* 54 Cal.3d at 751, 1 Cal.Rptr.2d 556, 819 P.2d 14.

■ This court has carefully weighed the private and public interest factors present in this case, and concludes that the forum non conveniens motion should be granted.

Canada provides an adequate alternative forum for resolution of this action. Canada permits litigation of the subject matter in dispute. *Piper,* 454 U.S. at 254, n. 22, 102 S.Ct. at 265, n. 22. While Canada might restrict the bringing of an emotional distress and mental anguish claim, it is not required that the Canadian remedy be exactly the same as the potential California remedy. An alternative forum need not provide all of the remedies and benefits which might be available in an American court, and is not unsuitable because a plaintiff's potential damages award may be smaller. *Zipfel v. Halliburton Co.,* 832 F.2d 1477, 1484 (9th Cir.1987) (quoting *Piper,* 454 U.S. at 255, 102 S.Ct. at 265–266).

**20.** *Piper* left open the issue of whether a federal court in a diversity action must apply state or federal *forum non conveniens* rules. 454 U.S. at 248 n. 13, 102 S.Ct. at 262 n. 13. Since the legal principles applied by *Piper* and the California courts are substantially identical, the choice of law issue is not important here.

**21.** The conditions were: (1) submission to jurisdiction in Sweden and Norway; (2) compliance with discovery orders of the Scandinavian courts; (3) agreement to make past and present employees reasonably available to testify in Swe-

den and Norway at defendants' cost if so ordered within the discretion of Scandinavian courts; (4) tolling of the statute of limitations during the pendency of the actions in California; (5) agreement to make documents in their possession in the United States available for inspection in Sweden and Norway, as required by Scandinavian law, at defendants' expense; (6) agreement that depositions in the United States might proceed under section 2029; and (7) agreement to pay any final judgments in the Scandinavian actions. *Stangvik,* 54 Cal.3d at 750, n. 2, 1 Cal.Rptr.2d 556, 819 P.2d 14.

The action can be pursued in Canada without undue delay. Defendant has agreed to be bound by the seven conditions required in *Stangvik*, and this Court's order will be subject to those conditions. The choice to file in California is not a substantial factor. Plaintiffs and their insureds are Canadians, and it is reasonable for Canada to incur the expense of a trial involving its own citizens. It is reasonable to believe that, if this action is tried in Canada, future Shiley heart valve cases brought by Canadians will also be tried in Canada.

Each side would likely suffer some disadvantage by trial in its home forum. This factor appears to balance equally.

Considering all factors, the court concludes that the interests weigh in favor of trial in Canada. Accordingly, the forum non conveniens motion will be granted, not to dismiss the action, but to stay it subject to the *Stangvik* conditions, to allow trial in Canada, retaining jurisdiction to make further orders as might be appropriate.

## III.  *DISPOSITION*

For the reasons stated above, the court concludes it has subject matter jurisdiction. Further, the court holds the present claim is not subject to blanket preemption by the Medical Device Amendments of 1976. Finally, the court grants the forum non conveniens motion, and hereby stays the action subject to the *Stangvik* conditions, to permit trial in Canada, and retains jurisdiction to make such further orders as might be appropriate.