Opinion
 

 BOREN, P. J.
 

 An individual was injured by an intraocular lens that had been surgically implanted in his eye. He sued the manufacturer and distributor of the device for damages. His suit was dismissed by the trial court.
 

 We conclude that the victim’s claims of negligence and strict liability under state tort law are preempted by federal law. His claim for breach of the implied warranty of fitness fails for lack of privity. However, his breach of express warranty and fraud claims, as well as his negligence per se claim that the manufacturer violated numerous federal regulations governing investigative device protocols, are sufficient to withstand a demurrer.
 

 Facts
 

 Appeal is taken from an order of dismissal after demurrers were sustained without leave to amend. In reviewing a ruling on a demurrer, we assume that
 
 *784
 
 the facts properly pleaded in the first amended complaint are true.
 
 (Moore
 
 v.
 
 Regents of University of California
 
 (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479,16 A.L.R.5th 903].)
 

 In September of 1983, appellant John C. Evraets underwent eye surgery at a hospital in Long Beach. At that time, a cataract was extracted, and an artificial lens was implanted. The lens was manufactured, designed, tested, distributed and sold by respondents Intermedies Intraocular, Inc., and Pharmacia Ophthalmics Inc.
 

 Following the operation, Evraets suffered pain; irritation; decreased vision; light sensitivity; deterioration of his eye structures, including macular, retinal and corneal damage; edema; and a detached retina and vitreous humor. He was ultimately obliged to undergo another surgery to replace the lens. In addition to his physical suffering, Evraets experienced emotional distress, shock and fright.
 

 In August of 1991, Evraets read a published article in which he learned that defects in respondents’ lens implant were the source of his injuries. He alleges that respondents’ implant had excessive contact with the interior structures of the eye; caused lacerations; was made of inappropriate materials; and embedded in the eye, making removal difficult.
 

 Evraets claims that respondents failed to perform sufficient studies to determine the safety and efficacy of their product; that they purposefully avoided federal regulations by not following the investigational protocols for intraocular lenses, by failing to obtain informed consent from patients participating in the investigational study, and by failing to report their findings; that they failed to give adequate warning of their product’s dangerous characteristics, or reveal that safer alternatives were available; and that they knew or should have known that the lens’s inherent design defects tended to cause sight-threatening complications and surgical complications when removal was necessary.
 

 Evraets instituted this action on July 2, 1992. He alleges causes of action against respondents for negligence, breach of implied and express warranty, strict liability, negligence per se, and negligent and fraudulent misrepresentation.
 

 Discussion
 

 Overview of Federal Regulatory Scheme
 

 This appeal requires an examination of the Food Drug and Cosmetic Act (FDCA). Medical devices are subject to a classification system under the
 
 *785
 
 FDCA. At one end of the classification spectrum, a device which does not present a potential unreasonable risk of illness or injury (appellant offers tongue depressors as an example) is subject only to the most general controls. These are class I devices. Class II devices are more complex than class I devices. At the far end of the classification spectrum, a manufacturer must obtain premarket approval for a device which is of substantial importance in preventing impairment of human health or which presents a potential unreasonable risk of illness or injury. The purpose of requiring premarket approval of these class III devices is “to provide reasonable assurance of the safety and effectiveness of the device.” (21 U.S.C. § 360c(a).) Intraocular lenses are a class III medical device.
 

 Intraocular lenses also fall into a special category relating to investigational usage, pursuant to Food and Drug Administration (FDA) regulation. These regulations, which are expressly authorized by statute, are intended to encourage innovation by exempting promising experimental devices from the usual safety and efficacy requirements.
 
 (Slater
 
 v.
 
 Optical Radiation Corp.
 
 (7th Cir. 1992) 961 F.2d 1330, 1331-1332.)
 

 The investigational device exemption (IDE) expressly exempts intraocular lenses from federal misbranding requirements; from federal registration requirements; from federal performance standard requirements intended to provide reasonable assurance of a device’s safe and effective performance; from federal premarket approval requirements; from federal record and reporting requirements obliging a manufacturer to notify federal authorities if it becomes aware that its device causes or contributes to death or serious injury, including damage to a body structure or problems necessitating medical or surgical intervention; from federal restricted device and good manufacturing practice requirements; and from federal color additive listing requirements. (21 U.S.C. § 360j(g); 21 C.F.R. § 813.1 (1994).)
 

 Preemptive Effect on State Claims
 

 The FDCA contains an express preemption clause which prohibits states from imposing “any requirement. . . which is different from, or in addition to,” federal requirements relating to the safety or effectiveness of medical devices intended for human use. (21 U.S.C. § 360k.)
 
 [1]
 

 An interpretive FDA regulation specifies that the offending state requirement may be one “established by statute, ordinance, regulation, or court
 
 *786
 
 decision . . . .” (21 C.F.R. § 808.1(b) (1994).) However, state or local requirements are preempted “only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.” (21 C.F.R. § 808.1(d) (1994).)
 
 [2]
 

 The federal regulation does not offend constitutional principles by referring to state court decisions. “State law” includes common law as well as statutes.
 
 {Erie R. Co.
 
 v.
 
 Tompkins
 
 (1938) 304 U.S. 64, 78-79 [82 L.Ed. 1188, 1194-1195, 58 S.Ct. 817, 114 A.L.R. 1487].) State regulation “can be as effectively exerted through an award of damages as through some form of preventative relief. . . . Even the States’ salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.”
 
 {San Diego Unions
 
 v.
 
 Garmon
 
 (1959) 359 U.S. 236, 247 [3 L.Ed.2d 775, 784-785, 79 S.Ct.773]. See plurality opn. of four justices and conc. opn. of Scalia and Thomas, JJ., in
 
 Cipollone
 
 v.
 
 Liggett Group, Inc.
 
 (1992) _ U.S. _ [120 L.Ed.2d 407, 425-426, 443-444, 112 S.Ct. 2608, 2620, 2634 ], concluding that civil suits exert a regulatory effect analogous to that of positive enactments and constitute a state “requirement” for preemption purposes.)
 

 Any reading of the preemption statute must be consistent with Supreme Court pronouncements that the states’ police powers are presumed not to be superseded by federal law unless state law actually conflicts with federal law addressing the same subject.
 
 {Cipollone
 
 v.
 
 Liggett Group, Inc., supra,
 
 _ U.S. _ [120 L.Ed.2d 407, 422-423, 112 S.Ct. 2608, 2617].) This is particularly true where the state regulation relates to the primarily local concern of public health and safety rather than the responsibilities of the national government.
 
 {Hillsborough County
 
 v.
 
 Automated Medical Labs.
 
 (1985) 471 U.S. 707, 719 [85 L.Ed.2d 714, 725, 105 S.Ct. 2371].)
 

 
 *787
 
 As amicus curiae observes, the Supreme Court instructs us that “ ‘ “[t]he purpose of Congress is the ultimate touchstone” ’ of pre-emption analysis.”
 
 (Cipollone
 
 v.
 
 Liggett Group, Inc.,
 
 supra,_U.S._,_[120 L.Ed.2d 407, 422-423, 112 S.Ct. 2608, 2617].) Clearly, the purpose of Congress in the area of investigational medical devices was to encourage a high degree of experimentation. Allowing patients to recover for injuries sustained when an experimental device turns out to be neither safe nor effective would deter future investigation and progress, thereby defeating the legislative purpose of exempting investigational devices from the usual FDCA safeguards.
 

 Negligence and Strict Liability
 

 State claims for negligence and strict liability undermine the congressional purpose of allowing lens manufacturers leeway in developing and perfecting their product. These theories are predicated on the notion that a manufacturer has a duty to market a safe product. By definition, experimental medical devices are not known to be safe products, yet society has an interest in encouraging their use, despite the risks involved: “[l]f experimental procedures are subject to hindsight evaluation by juries, so that failed experiments threaten to impose enormous tort liability on the experimenter, there will be fewer experimental treatments, and patients will suffer.”
 
 (Slater
 
 v.
 
 Optical Radiation Corp., supra,
 
 961 F.2d 1330, 1334 .)
 

 The
 
 Slater
 
 case involved facts similar to those in the case at bar. Slater’s 1984 intraocular implant caused pain and discomfort, a deterioration in his vision and an infection. It eventually had to be removed, with difficulty because it had become embedded in his eye. He sustained permanent damage to his eye. His suit alleged inadequate testing, defective design, and failure to warn the public of the lens dangers. (961 F.2d at p. 1332.) The Court of Appeals discussed the investigatory nature of the intraocular implant in the federal regulatory scheme. It recognized that the FDA had decided, “rightly or wrongly,” that these intraocular devices could be sold with minimal assurances of safety as part of a worthwhile experiment. Therefore, no state could engraft through its tort law a requirement that the lenses have additional safety and design features not required by federal law.
 
 (Id.
 
 at p. 1333.)
 
 [3]
 

 Slater
 
 has been followed in most jurisdictions which have considered the issue of allegedly defective intraocular lenses. There is an apparent unanimity of opinion that the manufacturers of intraocular lenses cannot be sued
 
 *788
 
 under state law theories of negligence or strict liability.
 
 (Gile
 
 v.
 
 Optical Radiation Corp.
 
 (3d Cir. 1994) 22 F.3d 540;
 
 Duncan
 
 v.
 
 Iolab Corporation
 
 (11th Cir. 1994) 12 F.3d 194;
 
 Covey
 
 v.
 
 Surgidev Corp.
 
 (N.D.Ohio 1993) 815 F.Supp. 1089; and
 
 Hunsaker
 
 v.
 
 Surgidev Corp.
 
 (M.D.Pa. 1992) 818 F.Supp. 744.)
 

 Breach of Warranty
 

 Evraets has alleged that respondents, in their manufacturing, design, construction, assembling, testing, inspecting, packaging, labeling, engineering, selling, supplying and distributing, expressly and impliedly warranted the fitness of their lens implant.
 

 The topic of implied warranties is addressed in an FDA regulation. The regulation states that the FDCA does
 
 not
 
 preempt state requirements of general applicability where the purpose of the requirement relates to products in addition to devices, such as the Uniform Commercial Code warranty of fitness. (21 C.F.R. § 808.1(d)(1) (1994).)
 

 California has adopted the Uniform Commercial Code implied warranty of fitness provision, which is a law of general applicability that relates to all products, not just medical devices. (Com. Code, § 2315.) The implied warranty of fitness requires that a buyer of goods rely upon the seller’s skill or judgment to select or furnish a suitable product.
 

 “It is settled law in California that privity between the parties is a necessary element to recovery on a breach of an implied warranty of fitness for the buyer’s use, with exceptions not applicable here.”
 
 (Anthony
 
 v.
 
 Kelsey-Hayes Co.
 
 (1972) 25 Cal.App.3d 442, 448 [102 Cal.Rptr. 113];
 
 Rodrigues
 
 v.
 
 Campbell Industries
 
 (1978) 87 Cal.App.3d 494, 500 [151 Cal.Rptr. 90].) The notable exception to this rule applies to manufacturers of foodstuffs.
 
 (Mexicali Rose
 
 v.
 
 Superior Court
 
 (1992) 1 Cal.4th 617, 621 [4 Cal.Rptr.2d 145, 822 P.2d 1292];
 
 Burr
 
 v.
 
 Sherwin Williams Co.
 
 (1954) 42 Cal.2d 682, 695-696 [268 P.2d 1041].)
 

 There is no privity between Evraets and respondents. Evraets did not rely on respondents’ judgment that an intraocular device was appropriate for him. Rather, he relied upon his physician’s skill or judgment to select or furnish a suitable product. Thus, Evraets cannot sue the manufacturers, suppliers or distributors of the lens on an implied warranty of fitness theory.
 

 The Supreme Court considered the topic of express warranties and federal preemption in
 
 Cipollone
 
 v.
 
 Liggett Group, Inc.,
 
 supra,_U.S. _
 
 *789
 
 [120 L.Ed.2d 407, 112 S.Ct. 2608]. The court observed that express warranties are not imposed by state law but rather are imposed by the warrantor. The court wrote, “[A] common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a ‘requirement
 
 ... imposed under State law' . . . .”
 
 ( U.S. at p__[120 L.Ed.2d at p. 429, 112 S.Ct. at p. 2622], italics in original.) In that instance, cigarette manufacturers allegedly made express warranties about smoking and health in their advertising or promotion.
 
 [4]
 

 In
 
 King
 
 v.
 
 Collagen Corp., supra,
 
 983 F.2d 1130 , the federal appeals court decided that the Supreme Court’s reasoning in
 
 Cipollone
 
 does not apply to the FDA’s regulation of noninvestigational class III medical devices. The
 
 King
 
 court reasoned that, unlike the cigarette manufacturers in
 
 Cipollone
 
 who were free to make any claims they wished about their product, the FDA “retains rigid control over the entirety of the labeling and packaging of class HI products, largely displacing the ability of manufacturers to make additional claims.” (983 F.2d at p. 1135.) This high level of control, the court concluded, “ensures that [medical device] manufacturers will not be held liable for packaging and labeling imposed by the FDA.”
 
 (Ibid.)
 

 Unlike the noninvestigational class III device in
 
 King,
 
 respondents’ implant is exempt from federal manufacturing, labeling, safe performance, and registration requirements. (21 C.F.R. § 813.1 (1994).) Thus, the FDA does not exercise the rigid or high degree of control over respondents’ product that it might exert over other class III devices. Any guarantees of fitness as to investigational devices would not be imposed by the FDA but rather could only be provided directly to consumers by the manufacturer. For these reasons, we conclude that this case is analogous to
 
 Cipollone,
 
 and that respondents’ alleged express warranty was not established by the state or federal government but by respondents.
 
 (Ministry of Health
 
 v.
 
 Shiley Inc.
 
 (C.D.Cal. 1994) 858 F.Supp. 1426;
 
 Papas
 
 v.
 
 Upjohn Co.
 
 (11th Cir. 1993) 985 F.2d 516, 519-520.) Accordingly, the demurrer as to express warranty must be overruled.
 

 Fraud
 

 While Congress intended to encourage the development of new medical devices, there is no evidence of a congressional intent to exonerate from liability manufacturers who engage in deceit to obtain approval to market their product. For this reason, we conclude that Evraets’s fraud claim survives a demurrer.
 

 
 *790
 
 As noted by the plurality in
 
 Cipollone
 
 v.
 
 Liggett Group, Inc.,
 
 supra,_ U.S._[120 L.Ed.2d 407, 112 S.Ct. 2608], there are two types of fraud claims that may be asserted in a federally regulated field. In one manifestation, a plaintiff claims that a manufacturer’s misleading advertising “neutralized the effect of federally mandated warning labels.” Because this claim is based on state law advertising requirements, it is preempted by federal law. (_ U.S. at p. _ [120 L.Ed.2d at pp. 429-430, 112 S.Ct. at p. 2623].) By contrast, a second fraud theory has to do with “a state law duty not to make false statements of material fact or to conceal such facts.”
 
 (Ibid.)
 
 A plurality of the court found that such claims are not preempted insofar as they rely on a “state law duty to disclose [material] facts through channels of communication other than advertising or promotion. Thus, for example, if state law obliged respondents to disclose material facts about smoking and health to an administrative agency, [federal law] would not pre-empt a state law claim based on a failure to fulfill that obligation.”
 
 (Ibid.)
 

 Evraets’ claim in this case is analogous to the nonpreempted type of fraud described in
 
 Cipollone.
 
 Respondents were obliged to disclose material facts about their product to an administrative agency. This obligation is entirely different from one that mandates truthful advertising and honest labeling.
 

 The First Circuit addressed the issue of fraud in the area of medical devices in
 
 King
 
 v.
 
 Collagen Corp., supra,
 
 983 F.2d 1130. The plaintiff in
 
 King
 
 was injured by an injection of collagen, a class III medical device. King asserted that the collagen manufacturer fraudulently obtained FDA approval for its product. Among the reasons the
 
 King
 
 court gave for denying the plaintiff’s fraud claim was that it was “at bottom, a failure to warn claim. It seeks to show that [the manufacturer] had a duty to provide different information in [its] packaging and labeling than that which was approved by the FDA.” (983 F.2d at p. 1136.)
 

 We do not agree with the
 
 King
 
 court that a manufacturer’s intentional misrepresentations or concealment about its product in order to obtain administrative approval amounts to nothing more than a failure to provide consumers with different packaging and labeling.
 

 It seems fair to say that for a medical device manufacturer to claim the shield of preemption, the manufacturer must “play by the rules.” If the manufacturer subverts the rules and obtains approval to market its product by misrepresenting the risks involved, knowing that this disinformation will
 
 *791
 
 ultimately harm patients, the injured party should be entitled to sue.
 
 [5]
 
 The federal scheme is designed to provide some measure of consistency to the manufacturing and marketing of medical devices. It is not designed to cover a more general obligation—the duty not to deceive. There is no reason to believe that the federal government intended to insulate medical device producers from longstanding rules governing fraud.
 

 Negligence Per Se
 

 Although the “traditional” state law claims of negligence and strict liability are preempted, some cases have recognized that an injured person may sue the manufacturer of an investigational medical device for failure to satisfy federal laws governing investigation protocol on a negligence per se theory. (See
 
 Slater
 
 v.
 
 Optical Radiation Corp., supra,
 
 961 F.2d 1330, 1334 and
 
 Reiter
 
 v.
 
 Zimmer, Inc.
 
 (S.D.N.Y. 1993) 830 F.Supp. 199, 204.)
 
 [6]
 
 Evraets has alleged that respondents committed negligence per se by failing to satisfy federal IDE requirements; by failing to obtain his informed consent; by failing to observe medical device reporting duties; and by distributing an “adulterated device.”
 

 Evraets’s claim falls into the intersection of state and federal law. The doctrine of negligence per se “provides that negligence of a person is presumed if he violated a statute or regulation of a public entity, if the injury resulted from an occurrence that the regulation was designed to prevent, and if the person injured was within the class for whose protection the regulation was adopted.”
 
 (Elsworth
 
 v.
 
 Beech Aircraft Corp.
 
 (1984) 37 Cal.3d 540, 544-545 [208 Cal.Rptr. 874, 691 P.2d 630]; Evid. Code, § 669.)
 

 A violation of federal laws and regulations establishing a standard of conduct may provide the basis for a state law claim.
 
 (Toole
 
 v.
 
 RichardsonMerrell Inc.
 
 (1967) 251 Cal.App.2d 689, 703-704 [60 Cal.Rptr. 398, 29
 
 *792
 
 A.L.R.3d 988] [finding a violation of FDCA requirements can form the basis for civil liability on a negligence per se theory]; accord,
 
 Stanton by Brooks
 
 v.
 
 Astra Pharmaceutical Products
 
 (3d Cir. 1983) 718 F.2d 553, 563-565 [FDA regulation violation was negligent per se];
 
 Orthopedic Equipment Co.
 
 v.
 
 Eutsler
 
 (4th Cir. 1960) 276 F.2d 455, 460-461 [79 A.L.R.2d 390] [FDCA violation gives rise to negligence per se claim].)
 

 State actions which echo or attempt to enforce federal standards are not preempted. The FDCA only preempts state requirements which are different from or in addition to federal requirements. (21 U.S.C. § 360k.) In applying a negligence per se theory, the state’s requirements are equal to the federal requirements; in fact, they simply adopt the federal standard of conduct. (See 21 C.F.R. § 808.1(d)(2) (1994).)
 

 1.
 
 Informed Consent
 

 Evraets first urges that respondents failed to secure his informed consent before surgery was performed to implant their intraocular device. The
 
 Slater
 
 court wrote that federal law requires that the experimental procedure be adequately explained to the patient, and that a medical battery is committed in the absence of an informed consent under state law. (21 U.S.C. § 360j(g)(3)(D).) The court observed that a lack of informed consent may form the basis for a claim which is not preempted by federal law.
 
 (Slater
 
 v.
 
 Optical Radiation Corp., supra,
 
 961 F.2d at p. 1334; see also
 
 Mitchell
 
 v.
 
 Iolab Corp.
 
 (E.D.La. 1988) 700 F.Supp. 877, in which the district court concluded that a plaintiff injured by an intraocular lens implant could proceed on a lack of consent theory.)
 

 The federal statute creating the IDE requires, “as a condition to the exemption of any device to be the subject of testing involving human subjects, that the person applying for the exemption . . . assure that informed consent will be obtained from each human subject (or his representative) of proposed clinical testing involving such device . . . .” (21 U.S.C. § 360j(g)(3)(D).) The elements of an informed consent are specified by regulation (21 C.F.R. § 50.25 (1994)), which is incorporated by reference into the IDE for intraocular devices. (21 C.F.R. § 813.66(a)(6) (1994).)
 

 At this stage in the proceedings, it cannot be discerned whether Evraets was adequately informed of the risks of the procedure. Nevertheless, respondents assert that under California law, they had no duty to secure Evraets’s informed consent, and that this duty devolved solely upon Evraets’s physician. Respondents contend that their liability under California law is limited to fulfilling only a duty to warn the physician who prescribed their intraocular lens of the device’s hazards. They reason that the physician “stands in
 
 *793
 
 the shoes of the consumer,” and therefore they are not liable to Evraets under any theory of recovery as a matter of law.
 

 Respondents’ reasoning derives from California cases addressing a pharmaceutical manufacturer’s duty to warn of its product’s hazards. The courts have held that a manufacturer’s duty to warn is discharged by adequately advising the doctors who prescribe a drug of its hazards. The theory is that a drug manufacturer has no duty to insure that its warnings reach a patient inasmuch as an expert, such as the prescribing physician, is the party who must read and understand the medication’s uses and contraindications. The manufacturer cannot be held strictly liable if it has provided adequate warning of
 
 known
 
 defects or dangers and the doctor fails in his duty to transmit these warnings to the patient. Conversely, if the manufacturer negligently overpromotes its products, or downplays their dangerous effects, it will not be relieved of liability for the foreseeable misuse of the drug and resulting injuries.
 
 (Brown
 
 v.
 
 Superior Court
 
 (1988) 44 Cal.3d 1049, 1062, 1066 [245 Cal.Rptr. 412, 751 P.2d 470];
 
 Stevens
 
 v.
 
 Parke, Davis & Co.
 
 (1973) 9 Cal.3d 51, 65, 69 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1095];
 
 Carmichael
 
 v.
 
 Reitz
 
 (1971) 17 Cal.App.3d 958, 989 [95 Cal.Rptr. 381].) This reasoning has been applied to an implanted medical device as well.
 
 (Hufft
 
 v.
 
 Horowitz
 
 (1992) 4 Cal.App.4th 8, 18 [5 Cal.Rptr.2d 377] [inflatable penile prosthesis].)
 

 We fail to see how these California cases immunize respondents from liability as a matter of law. We do not know how zealously respondents marketed their product to physicians, or whether they downplayed its effects. It is too early in the proceedings to say whether respondents knew of certain dangers or defects in their product, but failed to warn the FDA, which means that physicians using the devices would not, in turn, have been able adequately to advise patients such as Evraets of the risks and benefits of the operation in order to obtain an informed consent.
 
 (Hurley
 
 v.
 
 Lederle Lab. Div. of American Cyanamid
 
 (5th Cir. 1988) 863 F.2d 1173, 1179-1180 [factual question presented as to whether a drug manufacturer withheld from the FDA necessary information on which to base the warnings physicians were to give to their patients].)
 

 On the other hand, perhaps the warnings given to Evraets were perfectly adequate and Evraets’s consent complied with federal regulations. This question cannot be resolved by a demurrer when Evraets has alleged that his consent was uninformed, and did not comply with federal regulations, an allegation which for now we must assume is true.
 

 2.
 
 Product Adulteration
 

 The investigational protocols for intraocular lenses are specified at length in the federal regulations. (21 C.F.R. § 813 et seq. (1994)) Additional
 
 *794
 
 requirements applicable to all medical devices are listed in 21 Code of Federal Regulations section 803. An investigator’s failure to comply with these protocols means that the device is deemed “adulterated.” (21 U.S.C. § 351i).)
 

 Evraets’s complaint fails to illuminate which of the innumerable regulatory requirements respondents failed to satisfy. In this regard, his pleading is inadequate. Evraets must specify which of the protocols respondents violated. He cannot make respondents and the court guess at which law was violated.
 

 To the extent that Evraets’s brief on appeal lists particular regulations which could form the basis of his negligence per se claim of product adulteration, he can amend his pleading accordingly.
 
 [7]
 
 As with his contention that there was no informed consent, it cannot be resolved on demurrer whether respondents violated federally required reporting and other safety provisions in developing and marketing their product.
 

 Disposition
 

 The order of dismissal is reversed. The demurrers to appellant’s claims for negligence, strict liability and breach of the implied warranty are sustained without leave to amend. The demurrer to appellant’s claim of negligence per se based on a product adulteration theory is sustained with leave to amend. The demurrers to appellant’s claims of breach of express warranty, fraud, and negligence per se based on a lack of informed consent theory are overruled. Respondents to bear all costs on appeal.
 

 Gates, J., and Nott, J., concurred.
 

 A petition for a rehearing was denied November 22, 1994, and respondents’ petition for review by the Supreme Court was denied Feburary 16, 1995.
 

 [1]
 

 Section 360k states, in pertinent part: “[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
 

 “(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
 

 
 *786
 
 “(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.”
 

 [2]
 

 The regulations list a number of state requirements that are
 
 not
 
 preempted, such as those relating to warranties of fitness and fair trade practices; state requirements that are equal or substantially identical to federal requirements; state medical licensing requirements; state contract specifications for procuring devices; state health care payment criteria; state inspection of factory records or other general enforcement requirements; and state requirements preventing the manufacture of adulterated or mislabeled devices, unless they conflict with federal requirements. (21 C.F.R. § 808.1(d) (1994).) The regulations also list particular state requirements which
 
 are
 
 preempted: portions of California’s Sherman Food, Drug, and Cosmetic Law (Health & Saf. Code, § 26000 et seq.) relating to the branding and labeling of medical devices are expressly preempted. (21 C.F.R. § 808.55 (1994).)
 

 [3]
 

 The special exemption extended to intraocular lenses distinguishes this case from many of the authorities relied upon by the parties, none of which involved an IDE. (See
 
 Moore
 
 v.
 
 Kimberly-Clark Corp.
 
 (5th Cir. 1989) 867 F.2d 243 [plaintiff injured by toxic shock syndrome while using the defendant’s tampons];
 
 King
 
 v.
 
 Collagen Corp.
 
 (1st Cir. 1993) 983 F.2d 1130 [plaintiff injured by anti wrinkle collagen injections];
 
 Cameron
 
 v.
 
 Howmedica, Div. of Pfizer Hosp.
 
 (E.D.Mich. 1993) 820 F.Supp. 317 [plaintiff injured by artificial hip replacement
 
 *788
 
 implant];
 
 Callan
 
 v.
 
 G.D. Searle & Co.
 
 (D.Md. 1989) 709 F.Supp. 662 [plaintiff injured by defendant’s contraceptive intrauterine device].)
 

 [4]
 

 We note that privity is not a requirement for actions based upon an express warranty.
 
 (Seely
 
 v.
 
 White Motor Co.
 
 (1965) 63 Cal.2d 9, 14 [45 Cal.Rptr. 17, 403 P.2d 145];
 
 Rodrigues
 
 v.
 
 Campbell Industries, supra,
 
 87 Cal.App.3d 494, 500.)
 

 [5]
 

 In California, intentional misrepresentations need not be made directly to the injured party to be actionable. Representations made to one person with the intention that they be repeated to and acted upon by another gives the actor the same right to relief as if the representations had been made to him directly. This is true of fraudulent concealment as well.
 
 (Massei
 
 v.
 
 Lettunich
 
 (1967) 248 Cal.App.2d 68, 73 [56 Cal.Rptr. 232].) A duty to disclose arises at common law if material facts are known only to the defendant and the defendant knows that the plaintiff does not know or cannot reasonably discover the undisclosed facts.
 
 (Karoutas
 
 v.
 
 HomeFed Bank
 
 (1991) 232 Cal.App.3d 767, 771 [283 Cal.Rptr. 809].)
 

 [6]
 

 We note that there is no federal cause of action for FDCA violations. (See
 
 Merrell Dow Pharmaceuticals Inc.
 
 v.
 
 Thompson
 
 (1986) 478 U.S. 804, 810 [92 L.Ed.2d 650, 659-660, 106 S.Ct. 3229].) The FDCA states that all proceedings to enforce or restrain violations of its provisions shall be in the name of the United States. (21 U.S.C. § 337.) We perceive a difference between suing directly on the FDCA statutes and regulations and suing on a state law theory which incorporates the federal law as a standard of conduct.
 

 [7]
 

 Evraets argues that respondents violated various federal regulations requiring a safe and adequate investigation, proper promotion of use of the lens, adequate warnings to health care professionals of the dangers associated with the lens and the availability of safer alternatives, and notification of defects once these are brought to the manufacturer’s attention.