[No. F025915. Fifth Dist. June 4, 1998.]

ALL WEST ELECTRONICS, INC., Plaintiff and Appellant, v. M-B-W, INC., et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II., III. and IV.

**COUNSEL**

J. Steven Lempel for Plaintiff and Appellant.

Marderosian, Swanson & Oren, Warren R. Paboojian and Steven C. Clark for Defendants and Respondents.

**OPINION**

**WISEMAN, J.**—A concrete contractor leased a curb and gutter machine through an equipment company that assigned its lease to a financing agency. Suffice it to say, the machine did not work properly and the contractor alleged he suffered damage. The contractor sued the equipment company and the manufacturer of the curb and gutter machine based on various theories, which ultimately included implied warranty. Unfortunately for the contractor, prior to trial the equipment company filed for bankruptcy. We publish to reiterate that the holding of *U.S. Roofing, Inc.* v. *Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431 [279 Cal.Rptr. 533], has not eroded the contractual privity requirement set out in *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682 [268 P.2d 1041].

## Procedural and Factual History

Bill Russell (Russell) and his son, Don Russell, a licensed general contractor, formed All West Electronics, Inc. (All West) in 1990 as a concrete contracting company. Russell was responsible for administration and financing, and Don Russell directed operations. By 1992, All West was doing numerous residential and commercial concrete jobs, including single-family housing and apartment projects, parking lots, and shopping centers. They primarily did slab work and occasionally curb and gutter work. On smaller jobs All West's crew formed the curb and gutter by hand, and on larger projects it hired a subcontractor who used a curb and gutter machine. In the hope of increasing profits on curb and gutter work, Russell became interested in purchasing a curb and gutter machine.

Russell learned about slipform pavers produced by M-B-W, Inc. (MBW), a Wisconsin corporation, through an industry publication. Russell contacted C&R Parts and Equipment, Inc. (C&R), a California corporation, and spoke to C&R representative Gary Paschal. In May of 1992, Russell accompanied Paschal to Vacaville and observed an MBW paver in operation. Prior to this date, Russell had never used an MBW paver. Russell also saw an MBW demonstration paver operate at an All West jobsite in Tulare. The demonstration was conducted by Paul "Bud" Noble, MBW's western regional manager. Russell believed the output looked good, but noticed the curb was slightly "weavy." The paver stopped operating after 50 feet because of what Noble described as a loose or broken wire.

Russell gave Noble information describing the project for which he needed the paver.[1] According to Russell, Noble stated that MBW's slipform paver would perform as stated in MBW's brochure,[2] and offered to sell All West his demonstrator model. Russell declined the offer, opting instead to purchase a new machine.

Russell then began to negotiate the purchase of an MBW slipform paver from C&R. C&R quoted Russell a price of $53,129, plus freight, for a new machine. However, Russell decided to lease rather than buy the paver, and

[1]All West had contracted to do concrete work for Clovis East High School (presumably Buchanan High School), which included curb and gutter work with tight radius curves. Russell intended to obtain a paver machine so he would not have to subcontract the work out. At that time, the Clovis project was the largest concrete job All West had contracted to perform.

[2]The brochure stated MBW's slipform paver provided "State-of-the-Art Slipform Paving"; that it was able to perform "at rates equal to Big Machines with no sacrifice in the quality;" and that it "Out Performs big machines on small jobs . . . any jobs with tight radius work."

C&R arranged for Agri-Credit to provide financing. After leasing the paver to All West, C&R assigned the lease to Agri-Credit. The machine was delivered to All West on June 8, 1992.

Ed Taylor, MBW's field representative, went to the jobsite in Clovis to train All West's crew. The paver's output was uneven, and Taylor showed the crew how to straighten it by using a two-by-four board. Taylor operated the paver when they poured the tight radius turn planter boxes. He also showed the crew how to fill voids in the concrete by manually using concrete mud and hand trowels. The training lasted about 15 hours over 2 days.

All West began to have problems at the Clovis job with the MBW paver. Much of the curb and gutter poured with the use of the paver had to be pulled out and replaced manually. During the year and a half that All West worked on the Clovis job, the paver was used only one and one-half months. On its best day All West was able to do 645 lineal feet of curb and gutter using the paver. Russell testified the paver's output required more hand-work than he expected in order to correct the "undulating pattern" of the curb and gutter. Problems experienced by All West with the paver included erratic performance on the string line; the potentiometers and connectors repeatedly failed; and the paver dug into the ground and stopped. These problems required the All West crew to finish the work by hand.

In a letter dated August 14, 1992, Russell complained to Gary Paschal at C&R about the problems All West had been experiencing with the paver. At some point, Russell was told by Bud Noble that a short radius adapter would be installed, which was subsequently installed at C&R. Russell also requested that Gary Paschal add an auto slope control to the paver to address other problems.

After these modifications were made, All West tried to use the paver on the Takahashi Farms project. The paver poured only 50 to 60 feet before it stopped working. Russell had it towed to Ace Hydraulic for repairs. Ace diagnosed the problem and MBW sent the parts by air express to Ace to make the repairs. Russell personally moved the control panel to the rear of the machine in an attempt to improve the operability of the paver.

All West also tried to use the paver on the Civic Center project in downtown Fresno, but it produced only 300 of the 2,560 linear feet of curb and gutter required, and still required too much manual work.

At some point C&R filed for bankruptcy protection.

In March of 1993, Taylor and Noble installed a 'cross-slope control' on the paver, which was supposed to reduce the erratic motion problem. Russell wrote to Noble requesting reimbursement for the work done by Ace Hydraulic, and complaining that after the parts were installed the paver would not go in reverse. He also complained about the quality of the paver and that its maximum output was only 600 feet per day.

After installation of the flow diverter and the auto-slope control devices, All West tried to use the paver on the Kaufman and Broad job. They poured 150 feet but the work was unsatisfactory. Since it would have been too expensive to finish the job by hand, All West subcontracted out the remaining curb and gutter work. Later, Russell called Noble to express his dissatisfaction and unwillingness to continue using the paver. Noble asked Russell for another chance to show the paver could work properly. They agreed to a demonstration on March 30, 1993. Ed Taylor operated the paver and poured approximately 100 to 125 feet. The paver failed to follow the string line. Noble admitted the machine was "faulty" and asked if he could demonstrate his own model. The quality of the output of Noble's demonstrator model was better. Noble asked Russell to use it on a regular job to show the paver would produce quality product in a real job situation. All West's paver was transported to MBW's Corona plant and returned by May 10, 1993.

In April of 1993, All West contacted Frank Multerer, MBW's president, who prepared and delivered some molds at MBW's expense to be attached to the demonstrator paver so that it could be used at the Kaufman and Broad job. Ed Taylor attached the molds and his son operated the paver. On the first day, the paver produced 150 feet of fair output. On the second day, it poured approximately 2,500 feet of median curb. About 10 to 15 percent of the median poured had to be pulled out. Noble told Russell that MBW would pay for tearing out and repouring the concrete.

In a letter to Noble dated May 10, 1993, Russell reiterated his displeasure with the paver and requested that MBW pay for the cost of the demonstration. In a second letter written the same day, Russell listed the deficiencies of the paver. Russell never received a response to the letters, and MBW did not reimburse All West for its costs in the Kaufman and Broad job.

Frank Multerer testified that C&R was not an exclusive dealer but one of 1,200 dealers of MBW products. C&R also sold products of MBW's competitors. Further, there was no written contractual agreement between MBW and C&R.

C&R purchased the paver that was sold to All West from MBW. No one from C&R was ever authorized to negotiate contracts on behalf of MBW.

Instead, MBW merely sells the paver to C&R, and then C&R sells it to whoever they want for whatever price they can get. According to Multerer, there were federal laws against his company attempting to influence pricing.

Multerer explained that MBW did warranty work for All West on the paver because MBW is a small company and relies on satisfied customers for future sales. Thus, for commonsense reasons, MBW did not have a formal or rigid warranty policy.

Multerer testified that Bud Noble was employed by MBW as a sales administration person/salesman. He stated Noble's participation as an MBW sales representative was to demonstrate the product if some distributors wanted to sell it to the ultimate buyer. Noble did not get involved in contractual negotiations. In this case, MBW sold its product to C&R, not to All West.

Multerer testified that one of the problems with the All West machine was that Russell had spliced 46 to 48 wires on the control panel, which contributed to the machine's problems.

Brad Silva, attorney for Agri-Credit, testified the lease agreement for the paver was originally signed by C&R and All West. The lease was then assigned by C&R to Agri-Credit. Under the lease agreement, Agri-Credit owned the paver.

On May 3, 1994, All West filed a complaint for rescission of contract against C&R and MBW alleging breach of lease and fraud. MBW filed an answer on June 7, 1994, generally denying all the allegations and asserting numerous affirmative defenses. C&R did not file an answer.

MBW filed a cross-complaint against All West and C&R for moneys owed on the sale of unrelated equipment to All West. All West answered the complaint and added Agri-Credit as a defendant to its own complaint. Agri-Credit answered and cross-complained against All West and Russell for moneys owed based on the lease agreement entered into between C&R and All West. All West and Russell answered Agri-Credit's cross-complaint.

After an arbitration decision in favor of MBW and Agri-Credit, All West requested a trial de novo. On October 24, 1995, the court granted All West's motion to file a first amended complaint alleging three causes of action: breach of a lease agreement, breach of implied warranty of merchantability, and breach of the implied warranty of fitness for particular purpose.

On March 18, 1996, All West and Russell stipulated that a judgment be entered against them on Agri-Credit's cross-complaint in the amount of $63,236.60.

At the conclusion of All West's case-in-chief, MBW filed a motion for nonsuit which was denied. Prior to the jury returning a verdict, MBW made a motion for a directed verdict. In response to this motion, All West made a motion for leave to amend the pleadings to assert theories of negligent misrepresentation or breach of implied warranty based on an oral agreement. The motion for leave to amend was denied, and the motion for directed verdict was granted.[3] Judgment was entered in favor of MBW on April 18, 1996. All West filed a timely notice of appeal.

## DISCUSSION

### I. *Privity of contract vis-à-vis MBW and All West*

■ All West contends the trial court erred by granting MBW's directed verdict motion because, contrary to the trial court's conclusion, there was sufficient direct contact between MBW and All West to support a finding of vertical privity under the case of *U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra,* 228 Cal.App.3d 1431. We reject this contention.

In *U.S. Roofing,* U.S. Roofing purchased a crane through lease financing. It stopped making payments on the lease and brought a suit against National Crane (the manufacturer), LAS (the supplier), Steve Jones, LAS's president, and LSC (the leasing company). After a jury trial National Crane was not found liable, but judgment was entered in favor of U.S. Roofing, and against LAS and LSC. The pertinent factual background was summarized as follows:

"U.S. Roofing is a roofing contracting firm specializing in government roofing jobs. In 1983 U.S. Roofing was awarded a contract for the Alameda Naval Air Station in Oakland. U.S. Roofing determined that a crane would be needed to complete the work and began to contact dealers about purchasing a crane.

"Henry Jessup of U.S. Roofing contacted Steve Jones of LAS and discussed his needs for the job. They entered into negotiations for the purchase of a truck-mounted crane. An agreement on the type and price of a crane was reached and U.S. Roofing sent LAS a $1,000 earnest money deposit. This

---

[3]The court was unable to review the motion for directed verdict and rule on it until after the jury had returned a verdict of $68,467.60 in favor of All West.

was followed by a second deposit of $7,402.19. U.S. Roofing relied on LAS to arrange financing. LAS suggested a lease arrangement. . . . Of the two leasing companies to whom LAS referred U.S. Roofing, U.S. Roofing selected LSC and they entered into a lease agreement. Under the lease agreement U.S. Roofing selected the equipment and the supplier (LAS). LSC purchased the equipment and leased it to U.S. Roofing for a period of 57 months. An amendment to the lease gave U.S. Roofing an option to purchase the equipment at the end of the term of the lease for $8,049. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"The crane was delivered on August 24, 1983. U.S. Roofing never returned the certificate of acceptance because it did not receive the full roofer's package it ordered. Nonetheless, LSC paid the full purchase price of $116,000, less the two deposits, to LAS." (*U.S. Roofing, Inc.* v. *Credit Alliance Corp.. supra,* 228 Cal.App.3d at pp. 1438-1439.)

U.S. Roofing immediately began to experience problems with the crane. Its lawsuit against the various defendants was for breach of warranties. In its appeal, LAS contended it could not be liable for any breach of warranty as a matter of law because there was no privity of contract since there was no written agreement between it and U.S. Roofing. "Vertical privity is a prerequisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability. [Citations.]" (*U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra,* 228 Cal.App.3d at p. 1441.) The court rejected LAS's argument as follows: "This argument focuses solely on the paper contract; it ignores the considerable testimony regarding the direct dealings between LAS and U.S. Roofing for the sale and purchase of the crane. These parties had an oral agreement for the sale of the crane, supported by a deposit of $1,000, followed by a second deposit. LAS admits it made at least one express warranty as to the crane. When U.S. Roofing experienced problems with the crane, it contacted LAS for relief. Repairs on the crane were arranged and paid for by LAS. From this evidence the jury could find the necessary privity to support liability for breach of an implied warranty." (*U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra,* 228 Cal.App.3d at p. 1442.)

All West contends its case is virtually identical, and the same result should follow. To the contrary, this case is distinguishable on a very critical matter: There was no agreement between MBW and All West for the sale of the paver. Here, the sale was made by C&R. While the lease contract was between All West and Agri-Credit, the reasoning in *U.S. Roofing* might apply to C&R making it liable for any implied warranties. However, it

would not also extend to MBW, who essentially stood in the shoes of National Crane, not LAS. Here, there simply was no agreement between MBW and All West to support a finding of privity of contract between MBW and All West.

Privity of contract is a prerequisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability. "The general rule is that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." (*Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682, 695-696 [268 P.2d 1041]; accord, *U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra,* 228 Cal.App.3d at p. 1441; *Osborne* v. *Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 656 [243 Cal.Rptr. 815].)

Although All West claims there was an oral agreement between it and MBW, as will be discussed later, the record does not support this claim. However, MBW was not sued on a theory of breach of an oral agreement. Therefore, even if substantial evidence could support a finding that MBW entered into an oral agreement with All West, the allegations in the complaint required a finding that MBW entered into a written agreement with All West to support the requisite finding of privity. All West does not argue MBW was a party to the written agreement.

All West does, however, argue that even if the alleged oral agreement were disregarded, the jury could find vertical privity existed based on the direct dealings between MBW and All West. The cases relied upon by All West (*Evraets* v. *Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779 [34 Cal.Rptr.2d 852] and *Cedars of Lebanon Hosp.* v. *European X-ray* (Fla.Dist.Ct.App. 1984) 444 So.2d 1068) do not support its position.

In *Evraets*, the plaintiff was injured by an intraocular lens that had been surgically implanted in his eye. He sued the manufacturer and distributor of the device for, among other things, breach of implied warranty, and his suit was dismissed by the trial court on defendant's demurrer. In discussing the implied warranty theory, the court held:

" 'It is settled law in California that privity between the parties is a necessary element to recovery on a breach of an implied warranty of fitness for the buyer's use, with exceptions not applicable here.' [Citations.] The notable exception to this rule applies to manufacturers of foodstuffs. [Citations.]

"There is no privity between Evraets and respondents. Evraets did not rely on respondents' judgment that an intraocular device was appropriate for him.

Rather, he relied upon his physician's skill or judgment to select or furnish a suitable product. Thus, Evraets cannot sue the manufacturers, suppliers or distributors of the lens on an implied warranty of fitness theory." (*Evraets* v. *Intermedics Intraocular, Inc., supra,* 29 Cal.App.4th at p. 788.)

All West contends this means "contractual" privity is not required because the court did not mention the nonexistence of an agreement between the parties. Instead, it based its finding of no privity on the absence of direct dealings between the user and manufacturer, and not because there was no oral or written agreement between them. All West is attempting to get more mileage out of the *Evraets* case than is warranted. It is not surprising the *Evraets* court did not mention an oral or written agreement between the parties since there is no indication such an agreement was alleged in the complaint. Suffice it to say that "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) The *Evraets* case did not change the law requiring privity of contract for breach of implied warranty liability. Nor could it in light of *Burr* v. *Sherwin Williams Co., supra,* 42 Cal.2d at pages 695-696. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

In *Cedars of Lebanon Hosp.* v. *European X-ray, supra,* 444 So.2d 1068, the court noted "courts and jurisdictions differ as to when [a breach of implied warranties] cause of action will be allowed and under what circumstances." (*Id.* at pp. 1071-1072.) The court then refused to strictly adhere to the doctrine of privity because requiring the purchaser to go against the seller, who must proceed against the distributor, who must proceed against the manufacturer, "is wasteful and inefficient." (*Id.* at p. 1072.) While there may be sound policy reasons for eliminating the doctrine of privity in cases such as here, this argument must be made to the Legislature or the California Supreme Court, because we are bound to follow *Burr* v. *Sherwin Williams Co., supra,* 42 Cal.2d at pages 695-696, under *Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at page 455.

Since All West sued MBW for breach of a lease to which MBW was not a party, and because, unlike *U.S. Roofing,* there was no evidence MBW or its agent negotiated the sale of its paver to All West, the trial court properly granted the motion for directed verdict under the doctrine of privity. Notwithstanding All West's argument that " 'vertical privity' " and " 'privity of contract' " are different, the general rule that privity of contract is required for implied warranty liability applies because this case does not come under

any recognized exception to this general rule. (*Burr* v. *Sherwin Williams Co., supra,* 42 Cal.2d at pp. 695-696; *Fundin* v. *Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951, 956, fn. 1 [199 Cal.Rptr. 789].)

Finally, All West's reliance on the recent case of *Fieldstone Co.* v. *Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357 [62 Cal.Rptr.2d 701] is perplexing since that case defeats rather than supports its argument. The *Fieldstone* court distinguished the *U.S. Roofing* case for the same reasons we have—lack of contractual privity. There the court stated: "In *U.S. Roofing, Inc.* v. *Credit Alliance Corp., supra,* 228 Cal.App.3d at page 1442, parties were in privity for purposes of implied warranty claims where there was considerable evidence they dealt directly with each other vis-à-vis the purchase . . . ." (54 Cal.App.4th at p. 371, fn. 12.) Here the evidence establishes MBW did not deal directly with All West regarding the "purchase" of the paver. The sale/lease was negotiated between All West and C&R. Thus, All West's reliance on *Fieldstone* is misplaced.

II.-IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment is affirmed. Costs are awarded to the prevailing party.

Vartabedian, Acting P. J., and Buckley, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 2, 1998.

---

*See footnote, *ante*, page 717.