[No. G038255. Fourth Dist., Div. Three. Jan. 11, 2008.]

MICHAEL BLANCO et al., Plaintiffs and Appellants, v.
BAXTER HEALTHCARE CORPORATION et al., Defendants and
Respondents.

**COUNSEL**

Magaña, Cathcart & McCarthy, Brian R. Magaña and Anne M. Huarte for Plaintiffs and Appellants.

Drinker, Biddle & Reath, Alan J. Lazarus and Kathryn N. Forgie for Defendants and Respondents.

**OPINION**

**O'LEARY, J.**—Plaintiffs appeal from a judgment after the trial court granted defendants' motion for summary judgment in a wrongful death action

concerning a bileaflet mitral heart valve. The court granted defendants' motion for summary judgment on the ground the Medical Device Amendments (MDA), title 21 United States Code section 360k(a) (section 360k(a)), preempted plaintiffs' state common law causes of action. Plaintiffs argue the court erroneously concluded section 360k(a) preempted the state common law causes of action because a state law remedy for a manufacturing defect does not impose a state requirement "different from, or in addition to" a federal requirement relating to a device's safety or effectiveness. We disagree and affirm the judgment.

## FACTS

In 1982, 18-year-old Claudia Blanco (Claudia) was diagnosed with mitral valve stenosis—narrowing/blocking of the heart's mitral valve that prevents the valve from properly opening and, therefore, obstructs blood flow between the left chambers of the heart. Around the same time, Hemex Scientific, Inc. (Hemex), developed prototypes for new mechanical mitral and aortic heart valves. Hemex subsequently applied for an investigational device exemption (IDE) with the United States Food and Drug Administration (FDA) to conduct "clinical trials involving implantation of the device into humans." In April 1984, the FDA approved the IDE, which "allowed 15 identified medical centers to implant the devices in up to 500 patients" to "evaluate the safety and effectiveness of the device, and to establish design parameters, performance standards, and manufacturing/quality control protocols in [preparation for] potential commercial distribution of the device."

In February 1985, Hemex applied for a premarket approval (PMA) application with the FDA. The MDA divides medical devices into three classes, class I, class II, and class III.[1] (21 U.S.C. § 360c(a).) Class III devices are those that are "for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or "presents a potential unreasonable risk of illness or injury." (21 U.S.C. § 360c(a)(1)(C).) The FDA must approve a class III device, like the valve, before the device may be commercially distributed. (21 C.F.R. § 870.3925(b) (2007).) Subject to two statutory exceptions not relevant here,[2] class III devices must receive premarket approval through the PMA process "to provide reasonable assurance of [its] safety and effectiveness . . . ." (21 U.S.C. § 360c(a)(1)(C); see 360e(d)(2); 21 C.F.R. § 814.1 et seq. (2007).)

---

[1] Congress enacted the MDA in 1976 in response to increasing consumer and regulatory concern of the safety and effectives of medical devices. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 476 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Medtronic*).)

[2] The two statutory exceptions are the "grandfathering provision" (21 U.S.C. § 360e(b)(1)(A)), and the "substantially equivalent" provision (21 U.S.C. § 360e(b)(1)(B)).

The MDA requires the PMA application to contain the following information: full reports on investigations concerning whether the device is safe and effective; statements of the device's components, ingredients, and properties and principle or principles of operation; descriptions of the methods, facilities, and controls used for the manufacture, processing, packing, and installation of device; any performance standard which would be applicable to the device if it were a class II device and information the device meets such performance standard; device samples; proposed label specimens; and other information the FDA may require. (21 U.S.C. § 360e(c).)

FDA regulations require the PMA application to contain the following additional information: nonclinical laboratory studies, clinical investigations involving humans, indications for use, device description, alternative practices and procedures, marketing history, summary of studies, conclusions drawn from the studies, a complete description of the device, performance standards, technical reports, proposed labeling, and environmental assessment. (21 C.F.R. § 814.20(b) (2007).) The FDA conducts an indepth review of the PMA and approves, denies, or denies while identifying measures to place the PMA in approvable form. (21 U.S.C. § 360e(d); 21 C.F.R. § 814.44(c) (2007).) FDA approval of a PMA does not end its oversight of the class III device. (*Horn v. Thoratec Corp.* (3d Cir. 2004) 376 F.3d 163, 172 (*Horn*) [" '. . . For [PMA devices], after a very lengthy process involving thousands of pages of documentation and many hours of expert analysis, and often including substantial give-and-take between the agency and the manufacturer, FDA approves a new device, including detailed specifications for its design, manufacture, performance, labeling, and use. Any of these specifications may be changed in [a] way that affects safety and effectiveness *only with FDA's authorization*' "]; see also 21 C.F.R. §§ 814.39, 814.80, 814.82, 814.84 (2007).) The PMA process has been described as "rigorous," requiring "[m]anufacturers [to] submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission." (*Medtronic, supra,* 518 U.S. at p. 477.)

In February 1986, the FDA notified Hemex that its PMA application was "administratively acceptable and therefore, suitable for filing." The FDA, however, indicated Hemex had to provide additional information on a "fractured valve," including reports from the surgeon, a pathologist, and Hemex, change its labeling, and open its manufacturing facility for inspection.

Three months later, the FDA informed Hemex the PMA application was "approvable" subject to reports on "valve failures" during clinical trials and an FDA inspection of manufacturing facilities. In August 1986, the FDA notified Hemex that it approved Hemex's PMA application, and Hemex could begin production and marketing of the valve, subject to "conditions of approval,"

including approved labeling,[3] advertisements, PMA supplement, postapproval reports, and adverse reaction and device defect reporting.

Four months later, American Edwards Division of American Hospital Supply Corporation, a wholly owned subsidiary of Baxter-Travenol Laboratories, Inc. (Baxter), purchased Hemex (hereafter, referred to as Baxter). Baxter sold the valve under the name " 'Edwards-Duromedics Mitral Bileaflet Valve Model 9120' " (the Valve). The Valve was available only pursuant to a licensed physician's prescription.

On December 2, 1987, Claudia underwent surgery to repair her mitral valve, but it was unsuccessful. Three days later, surgeons replaced her natural mitral valve with the Valve, serial No. 26785, which had been inspected, tested, and certified for release.

Between August 1986 and May 1988, Baxter received "several reports" of possible Valve failures involving leaflet fracture and/or escape. By "May 1988, there were 12 reported incidents of leaflet escapes," after May 1988, 27 reported incidents of leaflet escapes, and by August 1994, 39 out of 20,000 Valves failed. Thirty-two out of the 39 failures involved mitral valves.

In May 1988, Baxter voluntarily suspended marketing of the Valve as a precautionary measure and notified hospital administrators and clinicians of its action. Two weeks later, the FDA reclassified the voluntary suspension as a " 'Class I Recall.' "[4] The FDA-administered recall required Baxter to notify Valve distributors and vendors of the recall and directed them to notify all vendors, hospitals, doctors, and patients of the recall.

In April 1989, the FDA notified Baxter the recall was completed, and therefore, terminated. In May 1991, Claudia underwent emergency surgery to remove a blood clot from her Valve after giving birth to her son. In February 1993, Baxter sent Claudia a letter informing her of reported problems with the Valves, but because of the unlikelihood of leaflet escape, Baxter did not recommend elective replacement of the Valve. The letter also asked her to enroll in a registry program, which was designed to provide information on the Valve. Baxter stopped marketing the Valve, which by that time was called the "Tekna" valve, in 1996.

In December 2002, 38-year-old Claudia was visiting her dying mother in Georgia while her husband and 11-year-old developmentally disabled son

---

[3] The FDA-approved labeling is included in the joint appendix.

[4] A class I recall "is a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death." (21 C.F.R. § 7.3(m)(1) (2007).)

remained home. Late one evening, she experienced chest pain, nausea, and shortness of breath. She was taken to the hospital and diagnosed with acute failure of her prosthetic mitral valve. She underwent emergency surgery, but died. The cause of death was "severe pulmonary edema with cardiorespiratory failure secondary to sudden severe mitral regurgitation." An autopsy revealed "two missing leaflet fragments of the [V]alve in the right common iliac artery." Subsequent evaluation of the Valve by a Baxter engineer revealed "the leaflet escape was due to central leaflet fracture that initiated at an erosion/cavitation leaflet pit."

Michael and Jonathon Blanco (hereafter, referred to collectively and in the singular as Blanco) filed a complaint against Baxter alleging causes of action for the following: (1) negligence, (2) strict liability, (3) breach of express warranty, and (4) breach of implied warranty. Baxter answered.

Baxter filed a motion for summary judgment, or alternatively, summary adjudication, based on the theory the MDA preempted Blanco's state common law causes of action. The summary judgment motion was supported by declarations from Allison Mezzanatto, Robert Stobie, and Thomas Moore. Blanco opposed the motions. Blanco's opposition was supported by a declaration from Attorney Brian Magaña. Blanco objected to Mezzanatto's declaration.

Baxter replied, supported by another declaration from Moore. Baxter responded to Blanco's objection to Mezzanatto's declaration.

The trial court granted Baxter's motion for summary judgment. The court's tentative ruling, which became its final ruling, stated: "[T]he FDA has been involved with every aspect of the [V]alve's design, testing, re-testing, and eventual recall. By allowing [Blanco's] . . . claims to stand, it would essentially be imposing a 'requirement' on a device which is 'different from or in addition to' a federal 'requirement' imposed under the MDA. That is clearly not permitted." The court overruled Blanco's objection to Mezzanatto's declaration. The court entered judgment for Baxter on January 29, 2007. Blanco appealed.

## DISCUSSION[5]

### I. *Relevant Law*

### A. *Standard of Review*

Summary judgment properly is granted if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) To secure summary judgment, a moving defendant has the "burden of showing that a cause of action has no merit if that party has shown . . . that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that . . . defense . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 849.)

On appeal, "we review the record de novo, considering all the evidence set forth in the moving and opposition papers[,]" including "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334–335 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; Code Civ. Proc., § 437c, subd. (b)(1), (2).) Inasmuch as the grant or denial of a motion for summary judgment strictly involves questions of law, we must reevaluate the legal significance and effect of the parties' moving and opposing papers. (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376 [63 Cal.Rptr.2d 522]; *Chevron U.S.A., Inc. v. Superior Court* (1992) 4 Cal.App.4th 544, 548 [5 Cal.Rptr.2d 674], disapproved on another ground in *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1245 [108 Cal.Rptr.2d 617, 25 P.3d 1096].)

### B. *Supremacy Clause*

 The supremacy clause of the United States Constitution provides that the "Laws of the United States . . . shall be the supreme Law of the

---

[5] We have received two requests for judicial notice. In the first request, Baxter asks we take judicial notice of the United States amicus curiae brief in *Riegel v. Medtronic, Inc.* (2d Cir. 2006) 451 F.3d 104 (*Riegel*), certiorari granted June 25, 2007, ___ U.S. ___ [168 L.Ed.2d 725, 127 S.Ct. 3000], the case in which the issue presented here is currently pending before the Supreme Court of the United States. In the second request, Blanco asks we take judicial notice of the American Association for Justice and Public Justice amicus curiae brief. However, it appears Blanco inadvertently submitted the wrong brief—"Brief for Petitioners." We deny both requests. (*Bach v. McNelis* (1989) 207 Cal.App.3d 852, 865 [255 Cal.Rptr. 232] [not proper for court to take judicial notice of truth of matters asserted in brief]; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479] [court does not "assume the truth of contentions, deductions, or conclusions" of law whether such appear on face of the pleading or exhibits thereto].)

Land . . . ." (U.S. Const., art. VI, cl. 2.) Hence, "state law that conflicts with federal law is 'without effect.' " (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*).) Central to determining questions of preemption is divining Congress's intent. (*Id.* at pp. 517–518.) In view of the historic importance of federalism in these areas, the states' police powers relating to public health and safety are not preempted by federal law unless Congress's intent to do so is clearly expressed. (See *Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 715 [85 L.Ed.2d 714, 105 S.Ct. 2371].) Moreover, where as here, Congress has included an express preemption provision in a statute, a court may not look beyond it to consider implied preemption. Rather, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." (*Cipollone, supra*, 505 U.S. at p. 517.) We turn now to the MDA's express preemption provision and its accompanying regulation.

## C. *MDA Preemption*

Section 360k(a), in relevant part, states: "[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." Pursuant to congressional authority (21 U.S.C. § 371(a)), the FDA has promulgated regulations governing the PMA process.

Title 21 Code of Federal Regulations part 808.1(b) (2007) provides guidance on the scope of the phrase "state requirement." It states, "[N]o State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision) . . . ."

FDA regulations also clarify the scope of MDA preemption. Title 21 Code of Federal Regulations part 808.1(d) states: "State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device

under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements. There are other State or local requirements that affect devices that are not preempted by [title 21 United States Code] section 521(a)[6] of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act: [¶] (1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices. [¶] (2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act. [¶] . . . [¶] (6) . . . [¶] (ii) Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition will be preempted if the requirement is different from, or in addition to, a Federal requirement established under the act. In determining whether such a requirement is preempted, the determinative factor is how the requirement is interpreted and enforced by the State or local government and not the literal language of the statute, which may be identical to a provision in the act."

D. *Medtronic*

In *Medtronic, supra*, 518 U.S. 470, the Supreme Court of the United States addressed the issue of whether section 360k(a) preempted various common law tort claims. In *Medtronic,* the device had not undergone PMA review, but had instead been approved pursuant to the "substantially equivalent" exception. In a five-to-four decision, the Court held section 360k(a) did not preempt any of the plaintiffs' common law tort claims. (*Id.* at pp. 501–503.) Justice Stevens's plurality opinion was joined by Justices Kennedy, Souter, and Ginsburg. Justice O'Connor concurred in part and dissented in part, and her opinion was joined by Chief Justice Rehnquist, and Justices Scalia and Thomas. Justice Breyer concurred in part and in the judgment, and joined five

---

[6] Title 21 United States Code section 521(a) is the former section number of title 21 United States Code section 360k, as formerly enacted in the MDA in 1976. (Pub.L. No. 94-295 (May 28, 1976) 90 Stat. 574.)

of the seven parts of Justice Stevens's opinion. Hence, the five parts of Justice Stevens's opinion in which Justice Breyer concurred (parts I, II, III, V and VII) form the opinion of the court in *Medtronic*.

Because the MDA contains an express preemption provision, a majority of the justices agreed the issue concerned the extent to which section 360k(a) preempts state law claims. (*Medtronic, supra*, 518 U.S. at p. 484.) Furthermore, speaking for a majority of the court in part V, Justice Stevens concluded the plaintiffs could maintain at least some state tort law actions for violations of FDA regulations. (*Id.* at pp. 494–495.) This, however, is where the agreement ends.

Justice Stevens, writing for himself and three other justices, rejected the defendant's assertion section 360k(a) preempts all common law suits because such claims always constitute "requirements." Justice Stevens reasoned the broad construction urged by the defendant "would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for [the plaintiffs'] alleged injuries." (*Medtronic, supra*, 518 U.S. at pp. 488–489, fn. omitted.) Justice Stevens's opinion found support in the plain language of section 360k(a). He reasoned the use of the term "requirement," rather than the term "remedy," indicated Congress intended to preempt "device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." (518 U.S. at pp. 487–489.) Accordingly, the plurality concluded "that when Congress enacted [section] 360k, it was primarily concerned with the problem of specific, conflicting state statutes and regulations rather than the general duties enforced by common-law actions." (*Id.* at p. 489.)

Reaching the opposite conclusion, Justice O'Connor wrote an opinion joined by three other justices in dissent. In their view, a common law duty came within the meaning of the term "requirement" as used in section 360k(a) because common law causes of action "operate to require manufacturers to comply with common-law duties." (*Medtronic, supra*, 518 U.S. at p. 510.) Therefore, these four justices would hold that a "fair reading" of the statute "indicates that state common-law claims are pre-empted . . . to the extent that their recognition would impose 'any requirement' different from, or in addition to, FDCA requirements applicable to the device." (*Id.* at p. 512.) Additionally, they did not believe the state common law had to be "specific"

to be preempted. Rather, under their reasoning, common law claims were preempted if they imposed obligations "different from, or in addition to," any requirement of federal law. (*Ibid.*)

Justice Breyer, concurring in part and in the judgment, nevertheless agreed with Justice O'Connor's interpretation that certain common law causes of action could constitute state "requirements" that would conflict with federal "requirements" and thus be preempted. (*Medtronic, supra*, 518 U.S. at p. 503.) He reasoned that to hold otherwise would invite anomalous consequences, and he set forth a hypothetical to illustrate his analysis: "Imagine that, in respect to a particular hearing aid component, a federal MDA regulation requires a 2-inch wire, but a state agency regulation requires a 1-inch wire. If the federal law, embodied in the '2-inch' MDA regulation, pre-empts the state '1-inch' agency regulation, why would it not similarly pre-empt a state-law tort action that premises liability upon the defendant manufacturer's failure to use a 1-inch wire (say, an award by a jury persuaded by expert testimony that use of a more than 1-inch wire is negligent)? . . . [¶] Consequently, I believe that ordinarily, insofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." (*Medtronic, supra*, 518 U.S. at pp. 504–505.)

The Courts of Appeal that have addressed MDA preemption have struggled with *Medtronic*'s language in the effort to discern its holding. *Medtronic* has been described as ambiguous (*Mitchell v. Collagen Corp.* (7th Cir. 1997) 126 F.3d 902, 911 (*Mitchell*)), "fractured in an all but irreconcilable manner" (*Goodlin v. Medtronic, Inc.* (11th Cir. 1999) 167 F.3d 1367, 1371 (*Goodlin*)), confusing (*Martin v. Medtronic, Inc.* (5th Cir. 2001) 254 F.3d 573, 578 (*Martin*)), and "wondrously complex" (*In re Medtronic, Inc., Implantable Defibrillators* (D.Minn. 2006) 465 F.Supp.2d 886, 892). Part V of Justice Stevens's opinion, however, in which Justice Breyer concurred, provides helpful guidance.[7]

■ We can interpret *Medtronic* as providing two main principles, each endorsed by five justices, for determining whether section 360k(a) preempts a common law tort action over a medical device. First, we must determine whether there are any device-specific federal requirements with respect to the Valve. (*Medtronic, supra*, 518 U.S. at pp. 497–500 (plur. opn. of Stevens, J.);

---

[7] When no single rationale commands the agreement of five justices of the Supreme Court, " 'the holding . . . may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .' " (*Marks v. United States* (1977) 430 U.S. 188, 193 [51 L.Ed.2d 260, 97 S.Ct. 990].) Therefore, Justice Breyer's concurrence takes on heightened significance in interpreting *Medtronic*'s holding.

*id.* at pp. 505–507 (opn. of Breyer, J., conc. in part & conc. in the judg.).) If so, we must determine whether there would be a conflict between that device-specific federal requirement and "any of the liability-creating premises of the plaintiffs' state-law tort suit." (*Id.* at p. 508 (opn. of Breyer, J., conc. in part & conc. in the judg.); see *id.* at p. 512 (opn. of O'Connor, J., conc. in part & dis. in part).) "[S]tate or local requirements that merely 'affect devices' are not preempted if such regulations are not 'requirements applicable to a device' within the meaning of the MDA." (*Kemp v. Medtronic, Inc.* (6th Cir. 2000) 231 F.3d 216, 225 (*Kemp*).)

## E. *California Cases*

There are two Court of Appeal cases addressing the scope of MDA preemption after *Medtronic.*

In *Armstrong v. Optical Radiation Corp.* (1996) 50 Cal.App.4th 580, 583 [57 Cal.Rptr.2d 763] (*Armstrong*), the Second District, Division One, addressed the issue of whether section 360k(a) preempted the plaintiff's "causes of action for negligence, strict liability, and breach of warranty" when she suffered a severe eye injury during cataract surgery from a product manufactured by the defendant. After discussing federal preemption principles, the MDA, and *Medtronic,* the court concluded the FDA's approval of the product's PMA application was a device-specific federal requirement. (50 Cal.App.4th at pp. 586–591, 593–594.) The court concluded section 360k(a) did not preempt the plaintiff's negligence and strict liability causes of action because the state law requirements "were not specifically developed with respect to medical devices," but are requirements of general applicability where the purpose of the requirement relates to other products in addition to medical devices. (50 Cal.App.4th at pp. 594–596.) The court concluded section 360k(a) did not preempt the plaintiff's breach of warranty claim that the product was not fit for its intended use based on FDA regulation, title 21 Code of Federal Regulations part 808.1(d)(1) (1996), which provides: "Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices." (*Armstrong, supra,* 50 Cal.App.4th at pp. 596–597.)

In *Steele v. Collagen Corp.* (1997) 54 Cal.App.4th 1474, 1477–1478 [63 Cal.Rptr.2d 879] (*Steele*), the Third District addressed the issue of whether section 360k(a) preempted the plaintiff's causes of action for strict liability, negligence, breach of implied warranty, breach of express warranty, fraud, and negligent misrepresentation after she developed an autoimmune disorder

after receiving a test injection of collagen. After discussing federal preemption principles, the MDA, and *Medtronic,* the court stated, "it is clear preemption does not apply to a state claim based on a manufacturer's violation of FDA requirements." (*Steele,* at pp. 1478–1486.) The court added, "The possibility of preemption, therefore, only arises when the state claim seeks to impose a requirement specific to the device that is not already imposed by the FDA." (*Id.* at p. 1486.) The court criticized the *Armstrong* court's analysis of whether the plaintiff's causes of action in that case concerned specific state requirements. The court stated, "This reasoning ignores Justice Breyer's statement in *Medtronic,* that common law standards of care and behavior impose specific requirements, even though the general duty may not. [Citation.] The *Armstrong* court espoused, essentially, the view of *Kennedy* [*v. Collagen Corp.* (9th Cir. 1995)] 67 F.3d 1453[,] [overruled in part on other grounds by *Medtronic, supra,* 518 U.S. 470], with respect to the specific state requirement element of preemption. That view, however, as reviewed above, was later repudiated by the Ninth Circuit in light of *Medtronic.* (*Papike v. Tambrands Inc.* [(9th Cir. 1997)] 107 F.3d [737,] 741.) Accordingly, we follow the view of the majority of justices in *Medtronic* and the court in *Papike.* Since common law standards of care and behavior impose state requirements that may be preempted, the only remaining issue is whether such state requirements are different from or in addition to specific federal requirements. [Citation.]" (*Steele, supra,* 54 Cal.App.4th at p. 1487.)

II. *Section 360k(a) Applicability to the Valve*

A. *Device-specific Federal Requirements*

It is undisputed Baxter filed a PMA application for the Valve, the Valve went through the PMA process, and the FDA approved the PMA for the Valve. California Courts of Appeal and numerous federal Courts of Appeal have held the FDA's approval of a PMA application is a federal requirement specific to a particular device. (*Steele, supra,* 54 Cal.App.4th at p. 1489; *Armstrong, supra,* 50 Cal.App.4th at pp. 593–594; *Scott v. CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 318–319 [44 Cal.Rptr.2d 902]; *Riegel, supra,* 451 F.3d at p. 117; *Horn, supra,* 376 F.3d at p. 169; *Martin, supra,* 254 F.3d at pp. 583–584; *Brooks v. Howmedica, Inc.* (8th Cir. 2001) 236 F.3d 956, 963–964; *Kemp, supra,* 231 F.3d at p. 228; *Mitchell, supra,* 126 F.3d at p. 911; but see *Goodlin, supra,* 167 F.3d at pp. 1373–1376; *Notmeyer v. Stryker Corp.* (N.D.Cal. 2007) 502 F.Supp.2d 1051, 1056–1057 [holding PMA was not device-specific medical requirement based on *pre-Medtronic* case *Kennedy v. Collagen Corp., supra,* 67 F.3d 1453].) These courts have reasoned the PMA process constitutes approval of a specific product's design, testing, intended use, manufacturing methods, performance standards, and labeling.

These courts' interpretation of the PMA process is supported by FDA regulations governing the PMA application process. Title 21 Code of Federal Regulations part 814.80 (2007) states: "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device."

Once the FDA approves a PMA application for a device, the manufacturer must comply with those conditions of approval in the PMA order. Any deviation from those conditions of approval concerning safety and effectiveness must be approved by the FDA. (*Horn, supra*, 376 F.3d at p. 172; 21 C.F.R. §§ 814.39, 814.80, 814.82, 814.84 (2007).) Based on the information Baxter was required to provide to the FDA concerning the Valve (21 U.S.C. § 360e(c); 21 C.F.R. § 814.20(b) (2007)), we conclude the FDA's approval of the PMA application for the Valve was a device-specific federal requirement that could preempt any conflicting state requirements.[8] That does not end our inquiry, however. We must now determine whether there were any state requirements that conflict with the device-specific federal requirements.

B. *Conflict Between Device-specific Federal Requirement and State Law Tort Suit*

■ As we explain above, the *Medtronic* court was fractured. However, it is clear from *Medtronic* that five justices agreed "state common-law damages actions do impose 'requirements' and are therefore pre-empted where such requirements would differ from those imposed" by the MDA. (*Medtronic, supra*, 518 U.S. at p. 509 (opn. of O'Connor, J., conc. in part & dis. in part); see *id.* at p. 504 (opn. of Breyer, J., conc. in part & conc. in the judg.).) To make this determination, we must carefully compare the allegedly preempting federal requirement and the allegedly preempted state requirement to determine whether they fall within the intended preemptive scope of the statute and regulations. To do so, we must examine the allegations made under each cause of action.[9]

---

[8] At oral argument, Blanco stated, and Baxter conceded, the approval of the PMA application did not impose any specific federal requirements concerning microporosity. This does not change our conclusion, however, because as we explain below, if any of Blanco's causes of action were successful, the result could be to impose a different state requirement concerning manufacturing that decreased the possibility of valve leaflet fracture.

[9] In its opposition to Baxter's motion for summary judgment, Blanco stated, "Plaintiffs admit that they have not presented evidence to support a claim for breach of express warranty." On appeal, Blanco does not argue otherwise. Therefore, we need not discuss this claim further.

## 1. *Negligence*

Blanco's negligence cause of action states Baxter "negligently designed, manufactured, compounded, tested or failed to test, inspected or failed to inspect, repaired or failed to repair, maintained, distributed, recommended, displayed and sold the aforementioned prosthetic mechanical heart valves and their component parts so that they were defective and dangerous products, unsafe for the uses and purposes for which they were intended, when used and applied as recommended by [Baxter], and each of them." Blanco also alleged Baxter "negligently failed to inform users of the aforementioned article and its component parts and constituents of its dangerous and defective character prior to its implantation in patients, including [Blanco's] decedent herein."[10]

In his complaint, Blanco asserts "broad" negligence claims asserting Baxter negligently manufactured the Valve and negligently failed to warn users of the Valve's manufacturing defect. We agree with Blanco these are general common law general claims that are not specific to the Valve. However, as we explain above, *Medtronic* informs us that section 360k(a) preempts state common law damages actions that impose requirements different from FDA-imposed requirements. To make this determination, we must look beyond Blanco's pleading to his moving papers, including his separate statement of facts and supporting evidence.

Blanco does not claim Baxter did not comply with the PMA process or the FDA-administered recall. In fact, in its opposition to Baxter's motion for summary judgment, Blanco states, "[T]riable issues of material fact exist as to whether a certain small number of the Model 9120 [V]alves would occasionally contain manufacturing defects (the undetected microporosities) even though they were produced in accord with the FDA-approved manufacturing protocol." Blanco conceded the same at oral argument and added that he was not claiming Baxter engaged in any fraud in the PMA or recall processes.

In his opposition to Baxter's summary judgment motion, Blanco asserts that with respect to his negligent manufacturing cause of action, the Valve failed because of manufacturing defects. Relying on postmortem evaluations of the Valve, Blanco contends the Valve failed because of a "central leaflet fracture initiated at an erosion/cavitation leaflet pit." Blanco relies on deposition testimony from Baxter employees that certain inspection and manufacturing changes, including "[c]hanging dimensional tolerances, changing the radii of the seating lip on the [V]alve annulus," and "[c]reating new inspection procedures to detect the presence of clustered microporosities," reduced the number of central leaflet fractures.

---

[10] On appeal, Blanco has abandoned his claim Baxter negligently designed the Valve.

We read Blanco's negligence claim to assert Baxter was required to alter its manufacturing process to eliminate microporosity to prevent pitting and fracturing. A jury verdict in favor of Blanco on his negligent manufacturing cause of action would impose a state requirement concerning safety and effectiveness on Baxter different from the FDA requirement imposed in the approved PMA application. (*Horn, supra,* 376 F.3d at pp. 171, 176–177 [relying on FDA's unequivocal opinion in amicus curiae brief "that state common law claims such as those made by [the plaintiff] against a PMA-approved device are preempted"]; *Martin, supra,* 254 F.3d at pp. 584–585; *Kemp, supra,* 231 F.3d at pp. 230–232; *Mitchell, supra,* 126 F.3d at pp. 913–914.)

■ Blanco's negligent failure to warn claim fails for the same reason. Blanco asserts Baxter "should have taken reasonable care to notify Claudia . . . or her surgeon prior to May 1991 of the 1988 [V]alve recall and/or the [V]alve's known risk of failure." Again, Blanco does not claim Baxter failed to comply with any FDA requirement regarding labels or warnings. As we explain above, FDA regulations require manufacturers to submit proposed label specimens with their PMA application. (21 U.S.C. § 360e(c); 21 C.F.R. § 814.20(b) (2007).) Additionally, FDA regulations govern the recall process, as evidenced by the FDA's letter to Baxter indicating the FDA completed its audit of the Valve recall and concluded the recall was complete. (21 C.F.R. §§ 7.42(a), 810 et seq. (2007).) A jury verdict in favor of Blanco on his negligent failure to warn cause of action would impose a state requirement on Baxter concerning labeling different from the FDA requirements imposed in the approved PMA application or recall warnings different from the FDA requirements imposed through the FDA-administered recall process (21 C.F.R. § 810.15 (2007)).[11] (*Horn, supra,* 376 F.3d at p. 179; *Kemp, supra,* 231 F.3d at pp. 236–237; *Cupek v. Medtronic, Inc.* (6th Cir. 2005) 405 F.3d 421, 424–425; *Papike v. Tambrands Inc., supra,* 107 F.3d at pp. 741–742; but see *Brooks v. Howmedica, Inc., supra,* 236 F.3d at pp. 962–963.) Therefore, we find section 360k(a) preempts Blanco's negligence cause of action for negligent manufacture and negligent failure to warn because a jury verdict in Blanco's failure would impose a state requirement on Baxter different from the device-specific federal requirements in the Valve's PMA.[12]

---

[11] Blanco complains that had Baxter notified her immediately of the recall, Claudia could have elected to have the Valve replaced when she had emergency surgery in 1991. As we explain above, the FDA regulations govern the recall, and there is no evidence Baxter did not comply with the FDA regulations.

[12] At oral argument, Blanco also posited that in addition to negligent timing of Baxter's warning, it should have also provided additional warnings to Claudia. Based on our review of the pleadings and moving papers, we conclude Blanco did not raise this theory below. But, for the same reasons his negligent timing argument fails, so would his additional warnings theory. A cause of action finding Baxter should have provided Claudia with additional warnings would impose state requirements different from the device-specific requirements imposed by the PMA and recall processes.

The fact the FDA implemented a class I recall of the Valve does not alter our conclusion. When the Valve was implanted in Claudia, it had been approved by the FDA through the PMA process. (*Baker v. St. Jude Medical, S.C., Inc.* (Tex.Ct.App. 2005) 178 S.W.3d 127, 134, fn. 5.) And, we have found no evidence in the record to support the conclusion the FDA revoked the Valve's PMA. The FDA's letter to Claudia stated it knew of 26 cases of leaflet escape out of 20,000 [V]alves implanted between the years 1982 and 1988. The FDA quantified the chance of leaflet escape as .029 percent per patient year. The FDA advised "elective replacement of the [V]alve [was] not recommended." Title 21 Code of Federal Regulations part 810.2(j) states, *"Recall* means the *correction or removal* of a device for human use where FDA finds that there is a reasonable probability that the device would cause serious, adverse health consequences or death." (Second italics added.) The FDA Web site provides further information on the effect of a recall. It states, "A medical device recall does not always mean that you must stop using the product or return it to the company. . . . If an implanted device (for example, a pacemaker or an artificial hip) is recalled, it does not always have to be removed." (FDA Learn About Medical Device Recalls <http://www.fda.gov/cdrh/recalls/learn.html#1> [as of Jan. 11, 2008].) The fact the FDA has implemented a class I recall does not necessarily mean the FDA has completely removed the device from the marketplace.

Finally, *Armstrong, supra,* 50 Cal.App.4th 580, does not persuade us otherwise. The *Armstrong* court concluded section 360k(a) did not preempt the plaintiff's negligence cause of action because it was not clear whether the plaintiff's claim was based on a violation of FDA requirements and the state law requirements imposed by the negligence claim were requirements of general applicability not specifically developed with respect to medical devices. (*Armstrong,* at pp. 594–595.) Here, Blanco does not allege Baxter failed to comply with any FDA requirement. As to *Armstrong's* second rationale, frankly we disagree. As the *Steele* court explained, the *Armstrong* court ignored Justice Breyer's concurrence in *Medtronic* concerning whether "common law standards of care and behavior impose specific requirements . . . ." (*Steele, supra,* 54 Cal.App.4th at pp. 1486–1487.)

## 2. Strict Liability

Blanco's strict liability cause of action states Baxter "designed, manufactured, compounded, packaged, distributed, tested or failed to test, constructed, fabricated, recommended, merchandised, promoted and sold a certain mechanical prosthetic mitral valve and its component parts, ingredients and constituents, which was intended by [Baxter], and each of them, to be used for all purposes for which such items are commonly or foreseeably used, to wit: the replacement of diseased or damaged mitral heart valves in human beings."

Although we again agree with Blanco that his strict liability cause of action is a general common law claim, we must look beyond the label to determine whether a jury verdict in favor of Blanco, on his strict liability cause of action, would impose a requirement on Baxter different from the FDA requirements in the Valve's PMA application. To make this determination, we again must look beyond Blanco's pleading to his moving papers, including his separate statement of facts and supporting evidence.

In his opposition to Baxter's motion for summary judgment, Blanco states, "In the case at hand, the question for strict liability is simply after the Model 9120 went through all of the . . . FDA-approved manufacturing procedures, even successfully passing all the tests and inspections, was it somehow defective in any event?" Blanco asserts the presence of microporosity that causes the Valve leaflets to pit and fracture is a manufacturing defect for which Baxter should be held strictly liable.

We similarly construe Blanco's strict liability claim to assert Baxter was required to alter its manufacturing process to eliminate microporosity to prevent pitting and fracturing. A jury verdict in favor of Blanco on his strict liability cause of action would impose a state requirement concerning the elimination of microporosity through manufacturing requirements on Baxter different from the FDA requirement imposed in the approved PMA application. Section 360k(a) preempts such a claim. (*Horn, supra,* 376 F.3d at p. 177; *Martin, supra,* 254 F.3d at pp. 584–585; *Mitchell, supra,* 126 F.3d at p. 913.) And as with Blanco's negligence claim, the fact the FDA implemented a class I recall of the Valve does not alter our conclusion. Finally, the defects in *Armstrong, supra,* 50 Cal.App.4th at pages 595–596, that render it unpersuasive with respect to Blanco's negligence claims are equally applicable to his strict liability claim. (*Steele, supra,* 54 Cal.App.4th at pp. 1486–1487.)

3. *Implied Warranty*

Blanco's breach of implied warranty cause of action stated: "Prior to the time that [Baxter], and each of them, manufactured, sold and distributed the above-mentioned mechanical prosthetic mitral valve and its component parts and constituents, and prior to the time that said article was implanted in [Claudia], [Baxter] . . . impliedly warranted to the general public, including . . . Claudia . . . , and her physicians and surgeons, that their mechanical prosthetic mitral valve and its component parts and constituents were of merchantable quality and safe for the uses for which they were intended and promoted by [Baxter] . . . . The prosthetic mechanical heart valve implanted in [Claudia] was, in fact, not safe for its intended uses or of merchantable quality as warranted by [Baxter] in that it had serious and dangerous propensities to fail catastrophically, and without warning, when put to its

intended use." Blanco states his breach of implied warranty claim is for breach of the implied warranty of merchantability (Cal. U. Com. Code, § 2314), and breach of the implied warranty of fitness for a particular purpose (Cal. U. Com. Code, § 2315), and both survive preemption pursuant to title 21 Code of Federal Regulations part 808.1(d) (2007).

Title 21 Code of Federal Regulations part 808.1(d) (2007) states: "State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device' within the meaning of section 521(a) of the act. The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act: [¶] (1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices."

Baxter claims section 360k(a) preempts breach of implied warranty causes of action for the same reason it preempts negligence and strict liability causes of action—a jury verdict in favor of a plaintiff would impose state requirements different from or additional to FDA requirements. Baxter raises a more fundamental issue, however—privity of contract. Baxter contends Blanco's breach of implied warranty causes of action fail because there is no privity of contract, and although the trial court did not grant summary judgment on these grounds as to these causes of action, we may affirm based on any legal ground. As we explain below, we agree with Baxter on the latter contention.

We may affirm an order granting summary judgment on a ground not relied on by the trial court, if the parties have been afforded the opportunity to brief the issue. (Code Civ. Proc., § 437c, subd. (m)(2).) Baxter raised the privity issue in its summary judgment motion, but the court did not rely on this ground to grant Baxter's motion. At oral argument, Blanco's appellate counsel agreed this issue was fully briefed. Therefore, we must now determine whether there was privity of contract. We conclude there was not.

■ "Privity of contract is a prerequisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability. 'The general rule is that privity of contract is required in an action for breach of

either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale.' [Citations.]" (*All West Electronics, Inc. v. M-B-W, Inc.* (1998) 64 Cal.App.4th 717, 725 [75 Cal.Rptr.2d 509].)

In *Evraets v. Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779, 784 [34 Cal.Rptr.2d 852] (*Evraets*), the plaintiff was injured by an intraocular lens that had been surgically implanted in his eye. He sued the manufacturer and distributor of the device for, among other things, breach of implied warranty, and his suit was dismissed by the trial court on the defendant's demurrer. After citing to the FDA preemption regulation (21 C.F.R. § 808.1(d) (1994)), and the general rule concerning privity of contract, the court stated: "There is no privity between [the plaintiff] and respondents. [The plaintiff] did not rely on respondents' judgment that an intraocular device was appropriate for him. Rather, he relied upon his physician's skill or judgment to select or furnish a suitable product. Thus, [the plaintiff] cannot sue the manufacturers, suppliers[,] or distributors of the lens on an implied warranty of fitness theory." (*Evraets, supra*, 29 Cal.App.4th at p. 788.)

Here, there is no evidence Claudia relied on Baxter's judgment that the Valve was appropriate for her. Rather, she relied on her physician's skill and judgment to select the Valve, as evidenced by the fact it was prescribed by a licensed physician. Accordingly, we conclude Blanco cannot sue Baxter for breach of implied warranties.

The cases Blanco relies on to support his claim there is no privity requirement are unpersuasive. Although the cases concluded section 360k(a) did not preempt the plaintiffs' breach of implied warranty causes of action (*Armstrong, supra*, 50 Cal.App.4th at pp. 594–597; *Duvall v. Bristol-Myers-Squibb Co.* (4th Cir. 1996) 103 F.3d 324, 330; *In re Medtronic, Inc., Implantable Defibrillators, supra*, 465 F.Supp.2d at p. 897; *Fogal v. Steinfeld* (1994) 163 Misc.2d 497 [620 N.Y.S.2d 875, 883]), none of the cases addressed the issue of privity. And, Blanco does nothing to distinguish *Evraets* from the facts of this case. Additionally, the case Blanco relies on to support his claim any person whose injury is reasonably foreseeable may bring a products liability action was an action in strict liability. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84].) Finally, the fact the FDA regulation exempts warranty of fitness claims from the scope of section 360k(a) preemption, does not mean we may ignore state law procedural requirements.[13]

---

[13] Because we conclude there was no privity of contract, we need not decide and express no opinion on the issue of whether section 360k(a) preempts Blanco's breach of implied warranty cause of action.

## DISPOSITION

The judgment is affirmed. Each party shall bear their own costs on appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 9, 2008, S161120.